**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

QORVIS COMMUNICATIONS, LLC,

    *Plaintiff-Appellee,*

   v.

CHRISTOPHER S. WILSON,

    *Defendant-Appellant,*

   and

KATHRYN L. WILSON; JAMES
ADAMS,

    *Defendants.*

No. 07-1967

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:04-cv-01276-TSE)

Argued: September 25, 2008

Decided: December 3, 2008

Before NIEMEYER and AGEE, Circuit Judges, and
Richard L. VOORHEES, United States District Judge
for the Western District of North Carolina,
sitting by designation.

———

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Agee and Judge Voorhees joined.

———

**COUNSEL**

**ARGUED**: David A. Temeles, Jr., BEAN, KINNEY & KOR-MAN, P.C., Arlington, Virginia, for Appellant. Sanford M. Saunders, Jr., GREENBERG & TRAURIG, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Raighne D. Delaney, BEAN, KINNEY & KORMAN, P.C., Arlington, Virginia, for Appellant. Debra McGuire Mercer, GREENBERG & TRAURIG, L.L.P., Washington, D.C., for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

By order dated August 20, 2007, the district court entered judgment on an arbitration award in favor of Qorvis Communications, LLC, a public relations firm, and against Christopher Wilson, a former public affairs executive with Qorvis, in the amount of $366,037.22. This amount represented damages resulting from Wilson's breach of an employment agreement with Qorvis. Wilson appeals the judgment, contending that the arbitration clause in the employment agreement did not provide for the entry of a judgment on the award as required by § 9 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 9, and therefore that the district court lacked authority under the FAA to confirm the award through entry of judgment. He also contends that the district court erred in failing to vacate the arbitration award on the grounds that (1) the arbitrator manifestly disregarded the law of damages, rendering an award that failed to draw its essence from the employment agreement; (2) the arbitrator exceeded his authority, in violation of §§ 10(a)(4) and 11(b) of the FAA, 9 U.S.C. §§ 10(a)(4), 11(b), by including revenues of a non-party to the arbitration proceeding; and (3) the arbitrator denied Wilson "the opportunity to substantially and meaningfully present evidence" when it excluded the testimony of a witness, in violation of § 10(a)(3) of the FAA, 9 U.S.C. § 10(a)(3).

The FAA authorizes courts to enter judgments on arbitration awards "[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award." 9 U.S.C. § 9. While the employment agreement at issue in this case does not explicitly contain the statutory language, it nonetheless clearly specifies that arbitration, in accordance with specified rules that authorize judicial enforcement, be the *exclusive* means of resolving disputes relating to the employment agreement or Wilson's employment. In view of this manifest intent, coupled with Wilson's conduct in pursuing court-ordered arbitration, we conclude that Wilson impliedly agreed to entry of a judgment on the award. Because we also reject Wilson's other challenges to the arbitration award itself, we affirm.

I

Christopher Wilson is a "consultant with expertise in research, polling, and political consulting," which earned him a "national reputation" in political circles. In July 2001, he went to work as a public affairs executive with Qorvis Communications, LLC, to "organize, develop and build the business of [Wilson Research Strategies] (a division of Qorvis)" and to serve as the division's chief executive officer. Under the initial arrangement between the parties, Wilson provided consulting services not only through Qorvis, but also directly to other persons and entities that he invoiced separately. In December 2003, however, Qorvis and Wilson entered into a new employment agreement, which provided that Wilson would continue to serve as president and chief executive officer of Wilson Research Strategies, but would "devote his full time, attention, skill, and energy" to the business of developing and building that division. The new agreement also obligated Wilson not to solicit Qorvis' clients, prospective clients, and employees for his own account during his employment and for 18 months after he left the employ of Qorvis and to preserve the confidentiality of Qorvis' trade secrets and other

proprietary information. The new agreement included an arbitration clause that provided:

> [A]ll disputes [with specified exceptions not at issue here] between the parties relating to this Agreement or otherwise arising out of or relating to Executive's [Wilson's] employment with [Qorvis] . . . shall be resolved exclusively by arbitration in Fairfax County, Virginia or Washington, D.C. . . . . The arbitration shall be conducted in accordance with the Employment Dispute Resolution Rules of JAMS.[1]

Notwithstanding Wilson's obligation to devote his full time and attention to Qorvis' business, Wilson nonetheless continued to provide political consulting outside of his employment with Qorvis and to invoice that work outside of Qorvis' system. He also began making and implementing plans to leave Qorvis and form his own business. Qorvis became aware of Wilson's activities by the spring of 2004. When attempts to renegotiate the employment agreement failed, Qorvis terminated Wilson's employment on October 22, 2004, and commenced this action.

In its complaint, Qorvis alleged that Wilson, along with others, conspired to form their own business in the fall of 2003 and thereafter "proceeded to divert lucrative business opportunities to themselves and divide hundreds of thousands of dollars in proceeds among themselves." It also alleged that Wilson and others "downloaded over 14 gigabytes (28,404 individual files) of Qorvis' highly confidential and proprietary information" for purposes of pursuing the new endeavor. The 16-count complaint contended that Wilson breached the 2003 employment agreement, breached his duty of loyalty and duty to maintain confidentiality of employer information, interfered with contractual and business relationships between

---

[1]JAMS is the trade name of and acronym for Judicial Arbitration and Mediation Services, Inc.

Qorvis and others, misappropriated trade secrets, converted Qorvis' property and trade secrets for his own commercial use, and committed computer fraud. The complaint sought a broad range of injunctive relief and damages.

In response to Qorvis' motion for preliminary injunction, Wilson contended that "[a]ll of Qorvis' claims (other than for breach of contract) are committed to arbitration . . . under Section 17(a) of the 2003 Employment Agreement and therefore, to the extent the agreement is valid those claims will be subject to dismissal by this Court." Also, in his answer and counterclaim, Wilson asserted as an affirmative defense that "Plaintiff may not recover the damages it seeks because some or all of the claims for relief must be pursued in arbitration." Finally, at the hearing before the district court on Qorvis' motion for a preliminary injunction, counsel for Wilson argued, "Fourteen of the sixteen counts that we are here on today are committed to arbitration under the employment agreement . . . . And [paragraph 17] clearly says that the only thing that the company can do in court is seek relief for violations of Section 6 and Section 8." The district court agreed and entered an order directing the parties to arbitrate and thereafter to advise the court when a final arbitration award had been entered. The court also granted in part and denied in part Qorvis' motion for a preliminary injunction and stayed further court proceedings pending the arbitration.

Without objection, the parties pursued arbitration, which progressed smoothly. Only two relevant procedural disagreements arose. The first involved the arbitrator's refusal to admit the testimony of Christopher Lowther, a witness proffered by Wilson, and the second was the arbitrator's decision not to allow Wilson to amend his counterclaim to add a count for defamation. After hearing testimony for nine days over a period of approximately three months, the arbitrator rendered a 25-page opinion, making findings of fact and deciding all of Qorvis' arbitrable claims in the complaint and all of Wilson's counterclaims. The arbitrator concluded that Wilson, by fail-

ing to devote his full time and attention to Qorvis' business and by pursuing his own opportunities, had breached the 2003 employment agreement and his duty of loyalty to Qorvis. The arbitrator also concluded that Qorvis owed Wilson unpaid expenses from 2001 through 2003. After the arbitrator set off Wilson's successful claims against Qorvis' successful claims, he entered a final award on March 8, 2007, in favor of Qorvis in the amount of $366,037.72 plus post-judgment interest of $60.17 per day.

Returning to court, Qorvis filed a motion to confirm the arbitration award and Wilson filed a motion to vacate it.[2] Following hearings, the district court denied Wilson's motion and granted Qorvis' motion, entering judgment in favor of Qorvis on August 20, 2007, in the amount of $366,037.22 plus interest running from the date of the arbitration award. From the district court's judgment, Wilson appeals.

## II

For his principal argument, Wilson contends that the district court "lacked authority" to confirm the arbitration award "because the 2003 Agreement fail[ed] to provide that 'judgment of the court shall be entered upon the award' either expressly or by reference." *See* 9 U.S.C. § 9.

While Qorvis acknowledges that the language of § 9 does not explicitly appear in the arbitration clause, it contends that the requirement of § 9 that the parties agree that a judgment is to be entered upon an arbitration award may be implied both from the final and binding nature of an arbitration clause and from the federal policy favoring arbitration. Qorvis relies on our decision in *Rainwater v. Nat'l Home Insurance Co.*, 944 F.2d 190, 192-94 (4th Cir. 1991) (per curiam), in which

---

[2]Initially, Wilson filed a motion to vacate only "aspects" of the award, but he later withdrew that motion and filed a motion to vacate the entire award.

we held that an agreement referring disputes to arbitration under the rules of the American Arbitration Association sufficed to imply that the parties intended to submit to binding arbitration and that the award could be enforced in court.

While the FAA does authorize a judgment to be entered on an arbitration award "[i]f the parties . . . have agreed that a judgment" may be so entered, 9 U.S.C. § 9, the Act also provides:

> *A written provision* in any . . . contract evidencing a transaction involving commerce *to settle by arbitration* a controversy thereafter arising out of such contract or transaction . . . *shall be* valid, irrevocable, and *enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added). The FAA also reflects a strong congressional preference for arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (recognizing the "liberal federal policy favoring arbitration agreements"); *Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006) (same). Consistent with this policy preference, the Supreme Court has noted that § 9 need not be satisfied by any magical language. Rather courts must undertake enforcement of arbitration awards "so long as the parties *contemplated* judicial enforcement." *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 128 S. Ct. 1396, 1405 n.6 (2008) (emphasis added). Indeed, we have held that a simple contractual reference of disputes to arbitration under the rules of the American Arbitration Association implies binding arbitration with authorization of enforcement of an award by judgment. *See Rainwater*, 944 F.2d at 191-94.

In this case, the arbitration clause mandates that specified disputes "be resolved *exclusively* by arbitration" under "the Employment Dispute Resolution Rules of JAMS." (Emphasis added). The clause also includes the provision that "[i]f

required by applicable law *to make this duty to arbitrate enforceable* as to any claim, [Qorvis] shall pay the cost of the arbitration proceeding . . . ." (Emphasis added). Moreover, the "JAMS Employment Arbitration Rules and Procedures" (hereafter "JAMS Rules"), that are referred to,[3] provide that "[*p]roceedings to enforce*, confirm, modify or vacate an Award will be controlled by and conducted in conformity with the Federal Arbitration Act . . . or applicable state law." JAMS Rule 25 (emphasis added).

It is true that the arbitration clause in this case does not, *in haec verba*, provide that "a judgment of the court shall be entered upon the award." 9 U.S.C. § 9. But the nature of the arbitration commitment and the parties' use of it leave little doubt that both Qorvis and Wilson contemplated binding arbitration with enforcement of any award through the entry of a judgment in a court.

First, the parties committed "all disputes" relating to the 2003 employment agreement or to Wilson's employment to arbitration and specified that such arbitration was the *exclusive* method for resolving the disputes. Second, the parties agreed to be governed by the JAMS Rules. Therefore, any award resulting from arbitration was, under the JAMS Rules, *final*, JAMS Rule 24, and *enforceable* in "*proceedings*" conducted under the FAA, JAMS Rule 25. Finally, the parties actually followed the specified arbitration process, without objection by either party, leading to a final award that both parties submitted to the district court. Qorvis sought confir-

---

[3]While the employment agreement refers to "the Employment Dispute Resolution Rules of JAMS," the parties agree there are no rules denominated precisely that way. Qorvis suggests that the contractual reference can be only to "JAMS Employment Arbitration Rules and Procedures," which govern JAMS arbitrations. We agree. *See also* JAMS Rule 1(b) (providing that JAMS Employment Arbitration Rules and Procedures are "deemed" to be invoked by a contractual reference to "Arbitration by JAMS under its Employment Rules" or to "Arbitration by JAMS without specifying any particular JAMS Rules").

mation of the award from the court, and Wilson sought vacation of it.

Thus, when Qorvis and Wilson agreed to arbitration as the *exclusive* method for resolving disputes, they excluded the possibility that disputes could be resolved *de novo* in court, and any award entered pursuant to the arbitration would therefore be final. *See Stavborg v. Nat'l Metal Converters, Inc.*, 500 F.2d 424, 427 (2d Cir. 1974) (reasoning that "[w]hatever 'final' means, it at least expresses the intent of the parties that the issues joined and resolved in the arbitration may not be tried de novo in any court"). When the parties also agreed to *resolve* disputes in arbitration, they similarly agreed that a "firm decision" on the dispute would be made in arbitration. *See Merriam-Webster's Collegiate Dictionary* 1061 (11th ed. 2007). And when the parties agreed to employ the JAMS Rules, they agreed that the arbitration award was to be "considered final, for purposes of . . . a judicial proceeding to enforce, modify or vacate the Award." JAMS Rule 24. In short, the parties agreed that "all disputes" would be *resolved* by arbitration; that arbitration would be the *exclusive* method for resolving a dispute; that the award would be *final*; and that the award could be enforced in court under the FAA. The parties' agreement thus excluded the possibility that pursuing an arbitration award was only a condition precedent to a *de novo* court litigation.

In addition, the arbitration clause in this case contains language explicitly anticipating *enforcement* of the award ("If required by applicable law *to make this duty to arbitrate enforceable* as to any claim, [Qorvis] shall pay the cost of the arbitration proceeding hereunder"), directly implying that a judgment on the award was contemplated.

Construing language far less specific, we have held that enforcement of an arbitration award by a court judgment was implied from the simple contractual reference of a dispute to arbitration. *See Rainwater*, 944 F.2d at 192-94. In *Rainwater*,

we considered language in a homebuyers warranty contract that committed coverage disputes to arbitration in accordance with the rules of the American Arbitration Association and provided that such arbitration was "a condition precedent to the commencement of any litigation." *Id.* at 192. We held that because the American Arbitration Rules assumed consent to entry of judgment on the arbitration award, "an explicit agreement to be bound by arbitration and consent to judgment . . . could be inferred by reference to rules which do provide for binding arbitration." *Id.* at 193. We also said:

> The core question is whether the parties agreed to arbitration as a binding process, one that would bar litigation, or whether the agreement to arbitrate was simply a dispute settlement process that was a condition precedent to litigation. . . . [A] court has jurisdiction to confirm an award only if the parties have agreed that the award is final.

*Id.* at 192. Relying on the liberal policy for enforcing arbitration agreements and the sophistication of the parties to the agreement in that case, we observed that our holding would not surprise the parties, as they were on notice that "resort to AAA arbitration [would] be deemed both binding and subject to entry of judgment unless the parties expressly stipulate[d] to the contrary." *Id.* at 194.

Wilson argues that the JAMS Rules are not as clear. Unlike the rules of the American Arbitration Association, there is no provision in the JAMS Rules stating explicitly that the parties to the arbitration are deemed to have consented that judgment be entered upon the award. *See Rainwater*, 944 F.2d at 192. Although it is true that the JAMS Rules do not contain such explicit language, they do undoubtedly imply the same. First, JAMS Rule 1(a) provides that the Rules "govern *binding* Arbitrations of disputes or claims." (Emphasis added). The word "binding" means that the parties are bound by the arbitration award and are not free to relitigate their claims *de novo*

in court. Further, because JAMS Rule 25 declares that "[p]roceedings to enforce" an arbitration award must be conducted under the FAA or analogous state law, it can only be referring to the FAA's procedures *to enforce* an award in court. The FAA does not contain any procedures to relitigate an award; to the contrary they *mandate* substantial deference to awards. *See* 9 U.S.C. §§ 10, 11 (authorizing vacation or modification of awards in very limited circumstances); *see also Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 (4th Cir. 1998) ("Review of an arbitrator's award is severely circumscribed"). And, of course, the arbitration clause at issue here makes any arbitration award binding. The clause mandates that disputes be "resolved exclusively" by arbitration under the JAMS Rules.

Further, unlike *Rainwater*, the arbitration clause before us does not contain any language that arbitration is a condition precedent to litigation. *See Rainwater*, 944 F.2d at 194. In *Rainwater*, we held that given the strong congressional preference for arbitration and the reference to the rules of the American Arbitration Association, only an explicitly expressed intention that the award not be enforced by the courts would suffice to make the award unenforceable. *Id.* The condition precedent language was held to be insufficiently explicit and the award was therefore enforceable. *Id.* Here, we have no language in the arbitration clause which would indicate that arbitration was intended to be simply a condition precedent to litigation and that the resulting award was not to be enforced. Rather, the language of the arbitration clause explicitly anticipates the enforceability of the award and is additionally supported by the JAMS Rules that specify enforcement in court under the FAA.

Thus, even without focusing on Wilson's conduct pursuing arbitration in this case, we conclude that by force of our decision in *Rainwater*, we must reject Wilson's argument that the more specific arbitration clause here did not contemplate enforcement through a court judgment. But in this case we

also have the conduct of the parties in pursuing arbitration under the arbitration clause and seeking its enforcement or vacation by the court, which indicates that court enforcement of the award was contemplated.

In response to Qorvis' motion for a preliminary injunction filed in the district court, Wilson contended that "[a]ll of Qorvis' claims (other than for breach of contract) are committed to arbitration . . . [and] those claims will be subject to dismissal by this Court." In his answer, Wilson also asserted an affirmative defense that "[p]laintiff may not recover the damages it seeks because some or all of the claims for relief must be pursued in arbitration." Wilson pressed these same points in oral argument, leading the district court to stay further proceedings, to direct the parties to arbitrate, and thereafter to advise the court when a final arbitration award had been entered. Wilson did in fact pursue the arbitration, without objection, and not only responded to Qorvis' claims, but also asserted *his own claims*, obtaining a counterclaim award. Only after the final award was made, imposing on Wilson an obligation to pay substantial damages, did he seek a court order to vacate it. Through his conduct, Wilson thus consented to entry of a court judgment on the award. Surely if his counterclaim award had exceeded Qorvis' award, he would not have objected to the court's entry of judgment.

Responding to similar conduct, the Second Circuit observed in *Stavborg*, "Whatever doubt remains as to the intent of the parties from the language of [the arbitration clause], that doubt is removed by the conduct of the parties to this case" in that they moved in federal district court under the FAA to vacate or modify the award. 500 F.2d at 427. The court held that "[u]nder these circumstances, it seems abundantly clear to us that both parties in fact consented to the entry of judgment on any arbitral award entered." *Id.*; *see also Booth v. Hume Publishing, Inc.*, 902 F.2d 925, 930 (11th Cir. 1990) (holding that where the agreement between the parties stated that arbitration would be final and binding and the dis-

senting party demanded and participated fully in the arbitration process, the requirements of the FAA had been met); *Place St. Charles v. J.A. Jones Constr. Co.*, 823 F.2d 120, 124 (5th Cir. 1987) (quoting *T&R Enterprises v. Cont'l Grain Co.*, 613 F.2d 1272, 1278-79 (5th Cir. 1980) (holding that when the parties invoked the power of the federal court by initially filing a complaint, they "invoked . . . the power of the court to enter a judgment on the arbitrator's award which was an outgrowth of the original action[,] sufficient to satisfy the [FAA's] requirements")); *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.*, 639 F.2d 386, 389 (7th Cir. 1981) (holding that "the agreement contemplated by § 9, however, need not be explicit"). *But see PVI, Inc. v. Ratiopharm GmbH*, 135 F.3d 1252, 1254 (8th Cir. 1998) (holding that "the mere inclusion of the phrase 'final and binding' in an agreement" is insufficient to make the award enforceable under the FAA).

In sum, the language of the arbitration clause in this case, the provisions of the JAMS Rules incorporated by it, and the conduct of the parties all indicate that both Qorvis and Wilson agreed to and contemplated final, binding arbitration enforceable in a court, thus satisfying § 9 of the FAA. For these reasons, we reject Wilson's argument that the district court was not authorized by the FAA to enter judgment on the award.

III

In support of his contention that the district court erred in not setting aside the arbitration award, Wilson claims first that the arbitrator manifestly disregarded the law of damages and entered an award that failed to draw its essence from the employment agreement. *See Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234-35 (4th Cir. 2006). He argues that the arbitrator shortened the 18-month non-compete period specified in the employment agreement and then enforced the shortened provision, despite the fact that the provision was likely unenforceable under Virginia law and the district court

was unwilling to enforce it. This argument, however, rests on a misunderstanding of the arbitrator's decision.

The arbitrator did not enforce the non-compete provision at all. Although Qorvis sought to enforce the non-compete clause, the arbitrator did not enforce it. The arbitrator ruled only that Wilson breached his duty to give his employment full time and attention and his duty of loyalty. In computing damages for those breaches, the arbitrator began with the 18-month non-compete period as relevant for determining Qorvis' lost profits. He then shortened that period, and on the basis of the shortened period awarded damages to Qorvis based on the profits it lost as a result of the two breaches the arbitrator found. Thus, rather than enforcing the non-compete clause in any form, the arbitrator simply used the non-compete period as a measure by which to compute damages, and then only after making adjustments based on the period he thought relevant.

"Courts of Appeals do not review the reasoning of arbitrators in determining whether their work draws its essence from the contract, but look only to the result reached; the single question is whether the award . . . is rationally inferable from the contract." *Apex Plumbing*, 142 F.3d at 193 n.5. In this case, the arbitrator did not write a new clause into the contract, modify an existing one, or compute damages irrationally. Rather, he considered the contract as a whole, including the non-compete period, to determine the proximity of lost profits caused by Wilson's breaches.

IV

Wilson next contends that the arbitrator exceeded his authority, in violation of §§ 10(a)(4) and 11(b) of the FAA, by including revenues of *his company*, WRS, Inc., when calculating damages, despite the fact that WRS, Inc., was not a party to the arbitration and no argument had been made nor evidence offered to pierce its corporate veil. Significantly, this

argument is inconsistent with the posture that Wilson assumed during the course of the arbitration.

During the course of the arbitration, substantial evidence was presented showing that Wilson sought and accepted compensation, in violation of the 2003 employment agreement, *either directly or indirectly through WRS, Inc*. And the profits lost by Qorvis were measured by the compensation paid directly to Wilson or indirectly to Wilson through his company, WRS, Inc. During the course of the proceedings, Wilson made no distinction between the work done while employed in the Wilson Research Strategies division of Qorvis and the work done through WRS, Inc. In response to the evidence, the arbitrator found:

> While engaged in consulting activities, [Wilson] conducted business as either "Christopher Wilson", "Wilson Research Strategies", "Wilson Research Strategies, Inc.", or the initials "WRS". [Wilson] used these monikers interchangeably and would episodically represent different degrees of business affiliation with [Qorvis].

Moreover, in his arguments before the arbitrator Wilson used WRS, Inc., losses in his own estimates of lost profits claimed *by him individually* as a result of Qorvis' alleged breach of the employment agreement.

Thus, in computing Qorvis' lost profits, the arbitrator simply used the income that Wilson derived for himself, directly or through his company WRS, Inc., to calculate the profits that Qorvis lost as a result of Wilson's breaches of the employment agreement. Wilson can hardly now claim that the compensation he illegally obtained during the course of his employment should be sheltered from damage computations simply because he chose to channel some of that compensation through his company, WRS, Inc.

More importantly, it is our role to review the correctness of the arbitrator's reasoning only if the arbitrator "irrationally" disregarded the terms of the contract. *Apex Plumbing*, 142 F.3d at 193-94. The arbitrator's use of cash flow through WRS, Inc. was far from irrational and was indeed supported by the record and by Wilson's own submissions. We therefore cannot conclude that the arbitrator exceeded his authority by using WRS, Inc., income as a means of calculating Qorvis' lost profits. *See id.* (refusing to vacate an arbitration award on the basis that the arbitrator included inventory in the damage calculation that was expressly excluded by the agreement).

V

Finally, Wilson contends that the arbitrator refused "to hear evidence pertinent and material to the controversy," 9 U.S.C. § 10(a)(3), by not admitting the testimony of Christopher Lowther. Wilson proffered the testimony of Lowther in conjunction with his request, first made during the course of the arbitration proceedings, to amend his counterclaim to add a claim for defamation that allegedly occurred after the period relevant to the breaches of the employment agreement. The arbitrator refused the late amendment, as well as the testimony of Lowther, on the grounds that Lowther planned to testify to statements made by Qorvis in 2005 and 2006, long after the events that were at the core of the controversy.

We have carefully reviewed the record and conclude that the arbitrator acted well within his discretion under JAMS Rule 22(d), which gives the arbitrator discretion similar to that given to trial judges. We certainly cannot conclude that the arbitrator's refusal to receive Lowther's testimony "deprive[d] [Wilson] of a fundamentally fair hearing." *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 531 (4th Cir. 2007); *see also* 9 U.S.C. § 10(a)(3).

VI

In sum, we conclude that the arbitration clause in the 2003 employment agreement between Qorvis and Wilson autho-

rizes the district court to enter judgment on the arbitration award, and we find none of the grounds advanced by Wilson to be sufficient to justify vacation of that award. Accordingly, the judgment of the district court is

*AFFIRMED*.