PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CENTRAL WEST VIRGINIA ENERGY,
INC.,

    *Plaintiff-Appellant,*

  v.

BAYER CROPSCIENCE LP,

    *Defendant-Appellee.*

No. 10-1706

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Henry E. Hudson, District Judge.
(3:10-cv-00093-HEH)

BAYER CROPSCIENCE LP,

    *Plaintiff-Appellee,*

  v.

CENTRAL WEST VIRGINIA ENERGY,
INC.,

    *Defendant-Appellant.*

No. 10-1934

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Joseph R. Goodwin, Chief District Judge.
(2:10-cv-00348)

Argued: May 10, 2011

Decided: July 14, 2011

Before GREGORY and DUNCAN, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Gregory and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** Robert D. Luskin, PATTON BOGGS, LLP, Washington, D.C., for Appellant. Bruce E. Stanley, REED SMITH, LLP, Pittsburgh, Pennsylvania, for Appellee. **ON BRIEF:** Benjamin G. Chew, Andrew Zimmitti, Haven G. Ward, PATTON BOGGS, LLP, Washington, D.C., for Appellant. Colin E. Wrabley, REED SMITH, LLP, Pittsburgh, Pennsylvania; S. Miles Dumville, REED SMITH, LLP, Richmond, Virginia, for Appellee.

---

## OPINION

DUNCAN, Circuit Judge:

In this consolidated appeal, Central West Virginia Energy ("CWVE") appeals the judgments of the United States District Courts for the Eastern District of Virginia and the Southern District of West Virginia. CWVE challenges the determinations of both district courts that a Charleston, West Virginia arbitration panel (the "Charleston Panel") properly considered the validity of a 2008 agreement between CWVE and Bayer Cropscience LP ("Bayer"). Applying the highly deferential standard of review due arbitration awards, we find that the Charleston Panel did not exceed its powers. Accordingly, we affirm.

## I.

The relevant facts are not in dispute. This case centers on the interplay between two agreements containing competing arbitration provisions. A 1997 agreement between CWVE and Bayer mandated arbitration in West Virginia; a 2008 agreement sited it in Virginia. Some factual background provides helpful context for the parties' dispute.

## A.

Bayer operates an industrial park in Kanawha County, West Virginia. In 1997, Bayer's predecessor entered into a coal supply agreement (the "1997 Agreement") with CWVE, a subsidiary of Massey Energy Company, under which CWVE agreed to supply coal to the industrial park at a certain price for a term of two years. The 1997 Agreement provided that it could be extended for successive one-year terms if the parties agreed upon a new price. Significantly for our purposes, the 1997 Agreement also contained an arbitration clause providing that "[a]ll disputes under th[e] Agreement" would be referred to an arbitration panel in Charleston, West Virginia, and would be conducted under the rules of the American Arbitration Association ("AAA"). J.A. 47.

The parties extended the 1997 Agreement several times between 1997 and 2006. They disagree as to whether a series of emails between company representatives in 2006 effectuated a valid extension of the Agreement through the end of 2008.

In the spring of 2008, CWVE informed Bayer that it was not sure if the 2006 extension of the 1997 Agreement was valid, and a protracted debate ensued. In July 2008, in the midst of this uncertainty, a Bayer representative signed a new contract with CWVE to receive coal at an increased price through 2010 (the "2008 Agreement"). The 2008 Agreement provided for the arbitration of disputes "arising out of or relat-

ing to this contract or the breach hereof" in Richmond, Virginia. J.A. 62. It specified that the AAA's Commercial Arbitration Rules would apply and that the parties would each appoint one arbitrator, who would together select a third arbitrator. It also contained a merger clause stating that it set forth the entire agreement between the parties and "any prior agreements . . . relating to such transactions [were] merged into and super[s]eded by this Agreement." *Id.* at 61.

Bayer began paying CWVE the higher price specified in the 2008 Agreement, but did so under protest. Bayer maintained that the 1997 Agreement remained in effect, and that the 2008 Agreement was invalid.

## B.

The parties' disagreement led to litigation and arbitration in several fora, although only some of those proceedings are relevant here. On December 5, 2008, Bayer filed a claim for arbitration in Charleston, West Virginia, under the 1997 Agreement. Bayer sought a determination that the extension of the 1997 Agreement was valid and requested damages in the amount of $12 million incurred in purchasing coal at the higher price set by the 2008 Agreement. Bayer explained that it only paid the higher price to cover its obligations because CWVE threatened to stop delivery of coal if it refused to do so.

On March 30, 2009, CWVE filed a demand for arbitration before a panel convened in Richmond, Virginia (the "Richmond Panel") under the 2008 Agreement. It also moved the Charleston Panel to dismiss its arbitration proceedings, arguing that Richmond was the proper venue because the 2008 Agreement governed the dispute.[1] The Charleston Panel

---

[1]After CWVE filed its arbitration demand against Bayer in Virginia, Bayer filed a complaint in the Circuit Court of Kanawha County, West Virginia, seeking a declaration that the West Virginia arbitration should go forward and the Virginia arbitration should not. The state court dismissed that action upon determining that the parties' entire dispute belonged in arbitration.

denied this motion on the ground that "adequate facts ha[d] been alleged . . . to support a viable claim under the terms of the 1997 Agreement." J.A. 107.

During an arbitration hearing held in Charleston on November 9 through 12, 2009, CWVE continued to challenge the jurisdiction of the Charleston Panel to consider the 2008 Agreement. Alternatively, CWVE argued that if the Charleston Panel found that the 1997 Agreement had been extended through 2008, it was nevertheless terminated by the 2008 Agreement, which "superseded all prior agreements by virtue of its merger clause." J.A. 196.

On February 11, 2010, the Charleston Panel issued a Reasoned Award concluding that the parties had extended the 1997 Agreement through 2008. In rejecting CWVE's argument that the Charleston Panel should await and defer to the Richmond Panel's interpretation of the 2008 Agreement, the Charleston Panel explained that the validity of the 2008 Agreement was squarely before it:

> Nowhere in CWVE's extensive and impressive briefing in this case does it deal with its ambivalent, if not contrary, positions that it has directly interposed the July 2008 Agreement as a bar to any recovery by [Bayer] under the [1997 Agreement's] extension, yet [simultaneously] suggest[s] that the Panel cannot consider its validity or enforceability. The short answer to this argument is that CWVE has clearly ple[d] and argued the validity of the July 2008 Agreement throughout this proceeding. By doing so, it has placed that issue squarely before the Panel for a decision as to whether it bars enforcement of the [1997 Agreement's] extension, and it has waived its right to withdraw that aspect of the case from the jurisdiction of the Panel.

J.A. 303 (footnote omitted).

The Charleston Panel found that the 2008 Agreement "operated as a glaring breach" of the 1997 Agreement's extension, was formed under a mutual mistake of fact, and failed to meet the Uniform Commercial Code's requirements of good faith and fair dealing. J.A. 310-12. Accordingly, the Panel deemed the 2008 Agreement void and awarded Bayer stipulated damages in the amount of $10,540,885.07 plus fees.

The following month, on March 19, 2010, the Richmond Panel issued an order staying its proceedings "in light of the Reasoned Award dated February 11, 2010, of the Charleston Panel and the disposition made therein of issues common to this Arbitration now pending between the same parties involving the same transactions . . . ." J.A. 402. The parties reported at oral argument that proceedings in front of the Richmond Panel remain stayed pending resolution of this appeal.

C.

The dispute between the parties continued along dual tracks. On February 16, 2010, CWVE filed a petition in district court in Virginia seeking to vacate a portion of the Charleston Panel's award.[2] In response, Bayer filed a motion to dismiss in that forum. On March 17, 2010, Bayer filed an action in district court in West Virginia to enforce the panel award. CWVE moved to dismiss or stay the West Virginia action pending resolution of the related Virginia case.

In Virginia, CWVE asked the district court to vacate that portion of the Charleston Panel's arbitration award addressing the 2008 Agreement, renewing its argument that the 2008 Agreement's validity could be determined only by the Richmond Panel. The Virginia district court disagreed. It held that the issue of which arbitration panel should consider the 2008

---

[2]CWVE did not seek to vacate the portion of the Charleston Panel's award unaffected by the validity of the 2008 Agreement and paid Bayer that portion of the award, $2,391,390.16.

Agreement was a procedural question for the Charleston Panel to resolve. It therefore granted Bayer's motion to dismiss the petition on June 2, 2010, and CWVE appealed.

As a result of the Virginia district court's ruling, the district court in West Virginia denied as moot CWVE's motion to dismiss or stay Bayer's action pending resolution of the Virginia action. It then turned to the parties' cross-motions for summary judgment. The West Virginia district court agreed with its Virginia counterpart that the Charleston Panel did not exceed its powers by adjudicating the validity of the 2008 Agreement. The West Virginia district court found that "the dispute was properly submitted to arbitration under the terms of the [1997] Agreement," and that "determining the validity of the 2008 Agreement was necessary to the adjudication of the contract dispute." J.A. 444. It granted summary judgment to Bayer, and this consolidated appeal followed.

## II.

CWVE argues that both the Virginia and West Virginia district courts erred in finding that the Charleston Panel did not exceed its powers under the Federal Arbitration Act ("FAA") by adjudicating the validity of the 2008 Agreement. CWVE contends that the Virginia district court erroneously held that the Charleston Panel's jurisdiction over the 2008 agreement was a "procedural" issue properly left to the panel's discretion. It further argues that the West Virginia district court erred in upholding the Charleston Panel's rationale for exercising jurisdiction over the 2008 agreement. We review these legal challenges, brought under § 10(a)(4) of the FAA, 9 U.S.C. § 10(a)(4), de novo. *MCI Constructors, LLC v. City of Greensboro*, 610 F.3d 849, 857 (4th Cir. 2010).

The FAA stands as "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). Its "primary purpose . . . is to ensure that private

agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen S.A. v. Animalfeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (internal quotations omitted). In interpreting such agreements, we resolve "any doubts concerning the scope of arbitrable issues . . . in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25; *see also Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011).

Section 10(a)(4) permits a court to set aside an arbitration award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). However, our review of an arbitration panel's decision under this provision is "substantially circum-scribed." *MCI Constructors*, 610 F.3d at 857. A challenging party

> must clear a high hurdle. It is not enough . . . to show that the panel committed an error—or even a serious error. It is only when an arbitrator strays from inter-pretation and application of the agreement and effec-tively dispenses his own brand of industrial justice that his decision may be unenforceable [under § 10(a)(4)].

*Stolt-Nielsen*, 130 S. Ct. at 1767 (internal alterations, quota-tions, and citations omitted). With this demanding standard in mind, we turn first to the decision of the Virginia district court.

## A.

CWVE argues that, contrary to the Virginia district court's conclusion, the issue of which panel should consider the 2008 Agreement's validity is not a "procedural" one for arbitral res-olution, but rather a jurisdictional question that must be decided by the court in the first instance as a matter of "arbitra-

bility."[3] CWVE contends that the Supreme Court's decision in *Stolt-Nielsen*, 130 S.Ct. at 1758, narrowed the range of questions that can be labeled as "procedural" to an extent that controls the outcome here. In addressing this argument, we first consider the development of the distinction between questions of arbitrability and procedure. We then apply this framework to the question at hand.

1.

In *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002), the Supreme Court recognized an exception to the federal policy in favor of arbitration agreements: "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the *question of arbitrability*, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Id.* (internal alterations and quotations omitted). *Howsam* made clear, however, that not every "potentially dispositive gateway question" is one of arbitrability. *Id.* Rather, questions of arbitrability are limited to

> the kind of narrow circumstance where contracting
> parties would likely have expected a court to have

---

[3]CWVE also claims that the distinction between questions of arbitrability and procedure applies only at the stage of pre-award challenges, but has no import at the stage of a post-award challenge under § 10(a)(4), such as this one, because "the distinction whether a challenge to an arbitrator's jurisdiction is 'procedural' or 'substantive' . . . is irrelevant once an award is rendered." Appellant's Br. at 42. It cites no case law in support of this position, which we find unpersuasive.

The determination of whether a particular issue was for arbitral or judicial resolution is of critical importance to our determination, under § 10(a)(4), of whether the arbitration panel exceeded its powers in considering the issue. Indeed, *Stolt-Nielsen*, one of the primary cases on which CWVE relies, utilized the procedural/substantive distinction when reviewing an award under § 10(a)(4), thereby undermining CWVE's argument that the distinction should not be applied during review under this provision. *See* 130 S. Ct. at 1775-76.

decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

*Id.* at 83-84. Other "procedural questions which grow out of the dispute and bear on its final disposition are . . . for an arbitrator [ ] to decide." *Id.* at 84 (internal quotations omitted). Applying these rules, the Court concluded that the question presented in *Howsam* of whether the dispute was ineligible for arbitration because it was more than six years old was procedural in nature and therefore appropriate for arbitral resolution. *Id.* at 85.

In *Dockser v. Schwartzberg*, 433 F.3d 421 (4th Cir. 2006), we considered whether a party to an undisputedly binding arbitration agreement could compel litigation on the issue of whether one arbitrator or three should preside in light of *Howsam*'s guidance. *See id.* at 423. We concluded that "the question of the number of arbitrators [was] one of arbitration procedure, and that the parties' agreement [did] nothing to overcome the presumption that such questions are for arbitral, rather than judicial, resolution." *Id.* at 425.[4] As we explained, it would eviscerate the liberal federal policy favoring arbitration if "parties to a concededly binding arbitration agreement were nonetheless able to hale one another into court to contest even the most minor of issues regarding their arbitration." *Id.* at 428.

2.

Under the framework established by *Howsam* and *Dockser*,

---

[4]*Dockser* also stated, more generally, that a court should involve itself in an arbitration dispute "only when there is a question regarding whether the parties should be arbitrating *at all*." *Id.* at 426 (emphasis added).

we find that the issue here—whether the Charleston Panel or the Richmond panel should have decided the 2008 Agreement's validity—is procedural in nature. CWVE tries to characterize the instant dispute as one of arbitrability by arguing that it involves the "jurisdiction" of the panels. This argument is unavailing because, as we explain below, a dispute implicating the overlapping jurisdiction of two arbitration panels is not a matter of arbitrability that necessitates resolution by a court.

As *Howsam* makes clear, delineating an issue as either one of arbitrability or one of procedure serves the goal of preserving the former for *judicial* resolution. CWVE largely concedes the argument that it presents a question of arbitrability by asserting not that a court should decide the 2008 Agreement's validity, but merely that a different arbitration panel should consider it.[5] Its argument therefore does not implicate *whether* to proceed by arbitration, but *which arbitration panel* should decide certain issues. CWVE's contention is far more akin to a venue dispute than a question of arbitrability, and, as such, it is appropriate for arbitral resolution.

Here, as in *Howsam*, we do not risk "forcing parties to arbitrate a matter that they may well not have agreed to arbitrate," 537 U.S. at 84, by allowing the Charleston Panel to determine which issues it, as opposed to the Richmond Panel, should consider. By agreeing to have their entire dispute heard by arbitrators, CWVE and Bayer chose to remove the courts from such threshold disputes over how their arbitration should proceed. *See Dockser*, 433 F.3d at 428.

---

[5]CWVE makes much of the fact that the 1997 Agreement only provided for arbitration of disputes "under" that agreement, whereas the 2008 Agreement provided for arbitration of disputes "arising out of or related to" the 2008 Agreement. CWVE agrees, however, that it intended for the validity of both agreements to be determined between the two arbitration panels.

Moreover, it is worthy of note that CWVE has received precisely what it contracted for: the question of the validity of the 2008 Agreement remains pending before the very Richmond arbitration panel that CWVE argues should resolve it. The fact that the Charleston Panel deemed it necessary to consider the 2008 Agreement's validity in determining whether the 1997 Agreement remained in force may raise the question of whether that panel was impermissibly dispensing its own brand of industrial justice, a question to which we shortly turn, but it does not convert the parties' venue dispute into one of arbitrability. To the contrary, our duty to give primacy to the parties' intent and to resolve doubts in favor of arbitration reinforces our conclusion that the arbitrators, not the courts, should determine this gateway issue. *See Stolt-Nielsen*, 130 S. Ct. at 1773; *Moses H. Cone*, 460 U.S. at 24-25.

3.

CWVE attempts to avoid this conclusion by arguing that the Supreme Court's recent decision in *Stolt-Nielsen* changes the contours of the procedural/arbitrability distinction to such an extent as to impact our analysis. We disagree.

*Stolt-Nielsen* involved a dispute over whether a party who had agreed to submit a certain issue to bilateral arbitration could be compelled to submit to *class-action* arbitration of the same issue. The Supreme Court held that the arbitration panel "exceeded its powers" in finding that the parties' silence on the matter of class arbitration amounted to consent.[6] *Id.* at 1770. It explained that it would not defer to the arbitrators' view because consent to class arbitration did not fall within *Howsam*'s category of "procedural" questions. It found con-

---

[6]Unlike the instant dispute, the Court in *Stolt-Nielsen* was not faced with the issue of whether the arbitration panel had properly considered the issue before it, because the parties executed a supplemental agreement that "expressly assigned th[at] issue to the arbitration panel." 130 S. Ct. at 1772.

sent to class-arbitration not to be a procedural matter because the class-action construct wreaks "fundamental changes" on the "nature of arbitration." *Id.* at 1775-76. Specifically, it observed that class-action arbitration alters the rules of confidentiality and privacy, adjudicates the rights of absent parties, and raises the commercial stakes of arbitration. *Id.* at 1776.

According to CWVE, *Stolt-Nielsen* stands for the proposition that "courts must intervene under the FAA to enforce the parties' intent as to *who* should resolve their disputes." Appellant's Reply Br. at 9. CWVE reads *Stolt-Nielsen* too broadly.[7]

Although *Stolt-Nielsen* found that the particular question of whether parties had "*agreed to authorize* class arbitration" was not one of procedure, it reaffirmed the Court's view that many threshold questions *do* fall into the procedural category. *Id.* at 1776. Citing *Howsam*, it explained that by entering an arbitration agreement, parties "implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement." *Id.* at 1775. This authorization allows the arbitrator to supply those terms "essential to a determination of [the parties'] rights and duties," *id.* (internal marks omitted), so long as the arbitrator does not, in the process,

---

[7]CWVE also contends that *Stolt-Nielsen* overruled *Dockser* insofar as *Dockser* stated that only questions of whether to arbitrate "at all" are for a court to decide. *See Dockser*, 433 F.3d at 426. CWVE extrapolates this view from the fact that *Stolt-Nielsen* held that the question of consent to class arbitration, which does not implicate whether to arbitrate at all, was not a procedural question. We note, however, that *Stolt-Nielsen* also specifically declined to address whether it was for a court or an arbitrator to decide the issue of consent to class arbitration, noting that the parties had agreed to arbitrate the question. *See* 130 S. Ct. at 1772 (finding that the Court "need not revisit" the question of whether its previous judgment in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003), "requires an arbitrator, not a court, to decide whether a contract permits class arbitration"). Thus, *Stolt-Nielsen* did not directly contradict *Dockser*, and, as a subsequent panel, we may not lightly infer that a prior panel decision has been overruled. In any event, the statement in *Dockser* with which CWVE takes issue is not necessary to our holding.

commit the parties to a fundamentally different type or category of arbitration which they have not "*agreed to authorize*." *Id.* at 1776.

The issue before us does not transgress the limits of *Stolt-Nielsen*'s guidance. CWVE expressly "agreed to authorize" arbitration in both West Virginia and Virginia. As a result, its entire disagreement with Bayer is properly in arbitration; it contests only by whom the validity of the 2008 Agreement should be arbitrated in the first instance. The *Stolt-Nielsen* Court viewed the class-action mechanism contemplated there as constituting a fundamentally different process, altering the rules of confidentiality, implicating the rights of absent parties, and changing the commercial stakes of arbitration. *See id.* None of those concerns are present here. Although the Charleston and Richmond panels are constituted differently,[8] the parties' arbitration in each venue remains a bilateral proceeding that is subject to the same rules of privacy and confidentiality and is of comparable cost. *Stolt-Nielsen* does not support the proposition that a choice between two arbitration panels implicates the type of fundamental change that concerned the Supreme Court.

Accordingly, we affirm the Virginia district court's holding that the question of whether the Charleston Panel could con-

---

[8]CWVE tries to bring this dispute closer to the question at issue in *Stolt-Nielsen* by arguing that just as class-action arbitration "change[d] the nature" of arbitration, there are material differences between the arbitration procedures agreed to in the 1997 and 2008 Agreements that change the nature of arbitration in Charleston as compared to Richmond. In particular, CWVE points to the fact that the 1997 Agreement called for arbitrators to be selected from the AAA's list, whereas the 2008 Agreement called for each party to appoint one arbitrator, who together would choose a third. These are differences, to be sure, but we are constrained to disagree that they amount to fundamental changes in the nature of the arbitration agreed to by the parties.

sider the 2008 Agreement's validity was a procedural question properly for resolution by the panel.[9]

### B.

Our determination that the question of the Charleston Panel's jurisdiction over the 2008 Agreement is procedural does not end the analysis. CWVE argues that even if we find that the Charleston Panel had authority to rule on its jurisdiction over the 2008 Agreement, the panel nevertheless "exceeded its powers" under § 10(a)(4) by impermissibly creating its own theory of jurisdiction rather than grounding its ruling in the parties' contract.

Bayer asserts, and the Virginia district court appeared to agree, that we should not even reach this argument, because once an issue is deemed procedural, arbitrators cannot err in the way they decide it. This statement is too sweeping. To be sure, our review under § 10(a)(4) over a procedural issue that an arbitrator had authority to decide is exceedingly narrow: "if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (internal quotations omitted). However, we nevertheless have an obligation to ensure that the arbitrator's decision was "rationally inferable from the contract." *Qorvis Commc'ns, LLC v. Wilson*, 549 F.3d 303, 312 (4th Cir. 2008); *see also United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 39-40 (1987) (reviewing an arbitrator's decision on a procedural matter to ensure that it was "a construction of what

---

[9]Because we hold that the question of which panel should decide the validity of the 2008 Agreement was procedural, we do not reach Bayer's alternative argument that the parties ceded questions of arbitrability to the Charleston Panel by incorporating the AAA Rules into the 1997 Agreement.

the contract required," but explaining that even an error in interpretation would not require setting aside the award unless it amounted to "bad faith" or "affirmative misconduct" by the arbitrator).[10]

The West Virginia district court concluded that the Charleston Panel met this deferential standard because the dispute was properly before the panel under the 1997 Agreement's terms and a determination of the validity of the 2008 Agreement "was necessary to the adjudication of the contract dispute." J.A. 444. CWVE argues that this conclusion was in error, because the Charleston Panel actually based its jurisdiction on a novel theory of waiver rather than on any plausible interpretation of the parties' contract. In particular, it suggests that the Charleston Panel's exercise of jurisdiction was improperly rooted in the panel's conclusion that by arguing the validity of the 2008 Agreement throughout that proceeding, CWVE "waived its right to withdraw that aspect of the case from the jurisdiction of the Panel." J.A. 303.

The record shows, however, that the Charleston Panel anchored its decision to rule on the 2008 Agreement's validity in the authority granted to it by the 1997 Agreement to adjudicate "[a]ll disputes under th[at] Agreement." J.A. 47. It explained that CWVE "interposed the July 2008 Agreement as a bar to *any recovery* by [Bayer] *under* the [1997 Agreement's] extension," such that the 2008 Agreement's validity was integral to a determination of "whether it bar[red] enforcement of the [1997 Agreement's] extension." J.A. 303

---

[10]Other circuits review procedural questions decided by an arbitrator under similar standards. *See, e.g.*, *Trustmark Ins. Co. v. John Hancock Life Ins. Co. (U.S.A.)*, 631 F.3d 869, 874 (7th Cir. 2011) (noting that arbitrators' procedural decisions are reviewed only to ensure that they are interpreting the contract, not interpreting the contract correctly); *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 643 (9th Cir. 2010) (reviewing the arbitrators' decision on a procedural issue "only [to] determine whether the arbitrators' interpretation [of the contract] was plausible" (internal quotations omitted)).

(emphasis added). From this quoted language, we can discern that the panel treated its jurisdiction over "disputes under" the 1997 Agreement as the starting point of its analysis. It simply construed this grant of jurisdiction more expansively than CWVE believes it should have.[11]

Our determination that the Charleston Panel based its jurisdiction on a plausible reading of the parties' contractual language ends our inquiry under § 10(a)(4). Because we do not believe the Charleston Panel "irrationally disregarded the terms of the contract," it is not our role "to review the correctness of the arbitrator's reasoning." *Qorvis*, 549 F.3d at 312; *see also Misco, Inc.*, 484 U.S. at 38 ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.").

We therefore affirm the West Virginia district court's holding that the Charleston Panel did not exceed its powers under § 10(a)(4), and uphold the Charleston Panel's award in favor of Bayer.

---

[11]CWVE also argues that the Supreme Court's recent decision in *Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S. Ct 2847 (2010), established that the analogous phrase "arising under" *must* be construed narrowly. *Granite Rock* held that the phrase "arising under," as used in an arbitration clause, did not extend to cover disputes about the agreement's formation, even when the formation issue was raised as a defense. *Id.* at 2860-62. *Granite Rock* does not, however, compel the conclusion that the phrase "all disputes under" *cannot* be construed to extend to a defense raised to the continuing validity, rather than formation, of a contract. Accordingly, it does not change our conclusion that the Charleston Panel was at least "arguably construing or applying" the 1997 Agreement when it exercised jurisdiction over the 2008 Agreement. *Garvey*, 532 U.S. at 509.

## III.

For the reasons stated above, the judgments of the Virginia and West Virginia district courts are hereby

*AFFIRMED*.