**11-235-cv**
**UBS Fin. Servs. Inc. v. West Virginia Univ. Hosps., Inc.**

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2010

(Argued: April 14, 2011                     Decided: September 22, 2011)

Docket No. 11-235-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UBS FINANCIAL SERVICES, INC., UBS SECURITIES LLC,

           Plaintiffs-Appellants,

                    v.

WEST VIRGINIA UNIVERSITY HOSPITALS, INC., WEST VIRGINIA UNIVERSITY
HOSPITALS-EAST, INC., UNITED HOSPITAL CENTER, INC., CITY HOSPITAL
FOUNDATION, INC., WEST VIRGINIA UNITED HEALTH SYSTEM, INC.,

           Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: RAGGI and LOHIER, <u>Circuit Judges</u>, and PRESKA, <u>Chief District Judge</u>.[*]

       UBS Financial Services, Inc. and UBS Securities LLC (collectively, "UBS") appeal the
denial of their motion for a preliminary injunction enjoining the defendants from proceeding
with an arbitration before the Financial Industry Regulatory Authority ("FINRA"), and
alternatively requiring that the arbitration proceed in New York County. In the arbitration, the
defendants seek damages for UBS's alleged fraud in connection with the defendants' issuances
of auction rate securities. The District Court for the Southern District of New York (Marrero, <u>J.</u>)

---

[*] Chief Judge Loretta A. Preska of United States District Court for the Southern District
of New York, sitting by designation.

denied the requested injunction, held that a forum selection clause in one of the agreements between the parties was unenforceable because it conflicts with FINRA's rules, and ordered that the arbitration proceed in West Virginia. We hold that the defendants are entitled to arbitration because they became UBS's "customer" under FINRA's rules when they undertook to purchase auction services from UBS. We also conclude that the enforceability of the forum selection clause is a procedural issue for FINRA arbitrators to address and that the District Court lacked jurisdiction to resolve it.

AFFIRMED in part and VACATED and REMANDED in part.

ANDREW J. CERESNEY, Debevoise & Plimpton LLP, New York, NY (Jeremy Feigelson, on the brief), for Plaintiffs-Appellants.

JAMES R. SWANSON, Fishman Haygood Phelps Walmsley Willis & Swanson, LLP, New Orleans, LA (Joseph C. Peiffer; Athanasios Basdekis, Bailey & Glasser, LLP, Charleston, WV, on the brief), for Defendants-Appellees.

Jenice L. Malecki, Malecki Law, New York, NY (Braden W. Sparks, Dallas, TX; Lisa A. Catalano, St. John's University School of Law, Jamaica, NY; Robert C. Port, Cohen Goldstein Port & Gottlieb, LLP, on the brief), for Amicus Curiae The Public Investors Arbitration Bar Association.

Robert J. Giuffra, Jr., Sullivan & Cromwell LLP, New York, NY (Brent J. McIntosh; Ira D. Hammerman, Kevin Carroll, The Securities Industry and Financial Markets Association, Washington, DC, on the brief), for Amicus Curiae The Securities Industry and Financial Markets Association.

LOHIER, Circuit Judge:

Plaintiff-Appellant UBS Financial Services, Inc. ("UBS") appeals from a judgment of the

United States District Court for the Southern District of New York (Marrero, J.) dismissing its

action to enjoin the arbitration of claims filed by Defendant-Appellee West Virginia University

Hospitals, Inc. ("WVUH")[1] before the Financial Industry Regulatory Authority, Inc. ("FINRA") and declining to enjoin WVUH from proceeding with any action outside New York County pursuant to an agreement between the parties purportedly selecting New York as the applicable forum. We conclude, as a matter of law, that WVUH was UBS's "customer" under FINRA's arbitration rules and that WVUH's claims relating to its agreement to purchase UBS's auction services arise from its business dealings with UBS. We therefore affirm the District Court's judgment dismissing UBS's claims and affirm its order denying UBS's motion to enjoin arbitration. We further conclude that the enforceability of the forum selection clause at issue is a procedural question for FINRA arbitrators, not the courts, to decide in the first instance. We therefore vacate the District Court's order denying UBS's motion to enjoin WVUH from proceeding with any action outside New York County, and we remand with instructions to the District Court to dismiss that motion for lack of subject matter jurisdiction.

## BACKGROUND

The relevant facts are limited and not in dispute. UBS is a corporation engaged in a range of finance-based businesses. In particular, it has underwritten municipal bonds and similar securities and served as a broker-dealer responsible for facilitating auctions for certain auction rate securities ("ARS") in the form of auction rate certificates. At all relevant times, UBS was a FINRA member subject to FINRA's Code of Arbitration Procedure for Customer Disputes (the

---

[1] In addition to UBS Financial Services, Inc., UBS Securities LLC is also an Appellant and was a Plaintiff in the District Court. Defendants-Appellees also include West Virginia University Hospitals-East, Inc., United Hospital Center, Inc., City Hospital Foundation, Inc., and West Virginia United Health System, Inc. The individual corporate identity of the Appellants and Appellees does not affect our analysis of the issues presented in this appeal. For convenience, we refer to the Appellants collectively as "UBS" and to the Appellees collectively as "WVUH."

3

"FINRA Code" or the "Code").  WVUH is a not-for-profit health consortium that has issued

bonds to finance capital improvements and refinance existing debt.

In three separate offerings in 2003, 2005, and 2006, WVUH issued a total of $329

million of bonds, a significant portion of which were, at UBS's suggestion, structured as ARS

and issued in the form of auction rate certificates, which are floating-rate debt securities with

long-term maturities.  The offering documents associated with the issuances provided that the

interest rates on the bonds would be set through periodic Dutch auctions, in which buyers would

submit orders specifying the number of bonds they wished to purchase and the maximum interest

rate they were willing to pay.  As we recently explained:

> ARS are long-term bonds and stocks whose interest rates or dividend yields are periodically reset through auction.  At each auction, holders and buyers of the securities specify the minimum interest rate at which they want to hold or buy.  If buy/hold orders meet or exceed sell orders, the auction succeeds.  If supply exceeds demand, however, the auction fails and the issuer is forced to pay a higher rate of interest in order to penalize it and to increase investor demand.

Ashland Inc. v. Morgan Stanley & Co., --- F.3d ----, 2011 WL 3190448, at *1 (2d Cir. July 28,

2011).[2]  At UBS's recommendation, WVUH entered into derivative transactions in the form of

swap agreements, which were intended to create a synthetic fixed rate of interest payments for a

portion of the bonds and thereby protect WVUH against high interest rates.

For each offering, UBS served as both the lead underwriter and the main broker-dealer

---

[2] More specifically, in the type of auctions used for WVUH's bonds, purchase orders were filled beginning with the lowest interest rate bid until all bonds offered for sale were matched with purchase orders.  The interest rate at which the final order was filled then applied to all of the bonds until the next auction occurred.  Insufficient demand for all the bonds offered for sale, as occurred with WVUH's bonds beginning in 2008, resulted in the interest rate resetting to a "penalty" or "maximum" rate until the next auction.

4

responsible for facilitating the Dutch auctions in which WVUH's bonds were resold and their interest rates set. To establish the parties' rights and obligations in both contexts, the parties executed a pair of contracts for each of the three offerings: first, a broker-dealer agreement explaining UBS's duties in its capacity as a broker-dealer, and second, a purchase contract establishing the underwriter/issuer relationship and pursuant to which WVUH's bonds, termed "auction rate certificates," were sold to UBS. Each year, the same representatives of UBS and WVUH executed both the broker-dealer and purchase agreements, and the agreements were executed at nearly the same time. For the 2003 and 2005 offerings, the broker-dealer agreements were executed over three weeks prior to the purchase agreements. The purchase and broker-dealer agreements for the 2006 offering were executed within two days, on June 6, 2006 and June 8, 2006, respectively.

As the underwriter, UBS agreed to purchase the auction rate securities outright from WVUH at a discounted price and resell a substantial portion of them to UBS's customers and other dealers. UBS profited by exploiting the difference between the discounted price at which it purchased the bonds from WVUH and the price at which it resold them to the market. As the broker-dealer, UBS facilitated the auctions that determined the interest payable on the same bonds that it underwrote – for example, by soliciting and processing purchase and sale orders. In a provision entitled either "Compensation" or "Broker-Dealer Fee" that appears in each of the broker-dealer agreements in 2003, 2005, and 2006, WVUH agreed to pay UBS a substantial fee equal to either (1) 0.25 percent of the principal amount of bonds held or purchased pursuant to orders submitted for a particular auction, or (2) if no auction took place on a particular auction date, 0.25 percent of the principal amount of bonds held by holders through UBS, prorated to

5

reflect the number of days in the applicable auction period, to compensate UBS for facilitating the auctions. The same provision in all three broker-dealer agreements added that "the fee for the [auction rate certificates] shall be paid by [WVUH] and represents compensation for the services of [the] Broker-Dealer [UBS] in facilitating Auctions for the benefit of the beneficial owners of the [auction rate certificates]."

Although the broker-dealer agreements for the 2003 and 2005 issuances do not contain a forum selection clause, the 2006 broker-dealer agreement provides the following:

> The parties agree that all actions and proceedings arising out of this Broker-Dealer Agreement and any of the transactions contemplated hereby shall be brought in the County of New York and, in connection with any such action or proceeding, submit to the jurisdiction of, and venue in, such County.

J.A. 1036.

In February 2008, the ARS market collapsed, and the auctions for WVUH's bonds promptly failed. Thereafter, the swap agreements UBS had recommended failed to shield WVUH from high interest rates, forcing WVUH to pay significantly higher rates on the bonds until October 2008, when it refinanced its payments.

On February 12, 2010, WVUH initiated the FINRA arbitration that is the subject of this appeal by filing an arbitration Statement of Claim against UBS under Rule 12200 of the FINRA Code. Among other claims, WVUH alleged that UBS violated the Securities Exchange Act of 1934 and the Uniform Securities Act by advising WVUH to issue ARS while withholding critical information about the ARS market and UBS's role in it. The Statement of Claim also alleged that UBS fraudulently induced WVUH to purchase auction services, again by withholding critical information about the ARS market and UBS's role. For example, WVUH

claimed that UBS failed to disclose its practice of placing support bids in the Dutch auctions for ARS it underwrote (including WVUH's ARS), the significance of that support to the success of the auctions, and that the auctions for WVUH's bonds would fail as soon as UBS stopped submitting support bids. In addition to the substantive claims, WVUH alleged that FINRA had jurisdiction over the claims because WVUH was a "customer[] of [UBS] and this dispute [arose] from the business activities of [UBS], including but not limited to underwriting and broker-dealing." J.A.1065.

In May 2010, UBS filed this action in district court seeking a declaration that it had not violated any legal duty to WVUH and owed it no damages or other relief. With respect to both the bond issuances it underwrote and the auctions it agreed to facilitate, UBS asserted that WVUH was not its "customer" entitled to arbitration under FINRA Rule 12200. It moved for a preliminary injunction to halt the pending FINRA arbitration, or at least prohibit it from proceeding outside New York County in accordance with the forum selection clause in the 2006 broker-dealer agreement. Both parties submitted limited documentary evidence concerning the bond offerings and the parties' business dealings, including the underwriting agreements and the broker-dealer agreements between the parties from 2003 through 2006, none of which contains an arbitration clause or refers to the FINRA Code. For its part, WVUH relied principally on two declarations submitted by the Chief Financial Officer ("CFO") of United Health Center, Inc. and the CFO of West Virginia University Hospitals, Inc. Both declarations stated that UBS advised WVUH on the appropriate bond-issuance structure, facilitated the auctions at which the bonds' interest rates were set, and "performed various other tasks as WVUH's advisor, partner, agent, and fiduciary" in connection with the issuances. J.A. 1174.

7

On January 4, 2011, the District Court denied UBS's motion for a preliminary injunction. UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 760 F. Supp. 2d 373 (S.D.N.Y. 2011). Although it determined that UBS would suffer irreparable harm if it were "'forced to expend time and resources arbitrating an issue that is not arbitrable,'" id. at 377 (quoting UBS Sec. LLC v. Voegeli, 684 F.Supp.2d 351, 355 (S.D.N.Y. 2010)), the District Court concluded that UBS had not demonstrated a likelihood of success on the merits or serious questions going to the merits. With respect to whether WVUH became UBS's customer, the court concluded that the existence of an issuer-underwriter relationship between WVUH and UBS sufficed to establish WVUH's status as UBS's customer under FINRA's rules. Relying on Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d Cir. 1987), and J.P. Morgan Securities Inc. v. Louisiana Citizens Property Insurance Corp., 712 F. Supp. 2d 70 (S.D.N.Y. 2010), the District Court held that "FINRA intended for an issuer to be a customer of an underwriter." 760 F. Supp. 2d at 378.

The District Court then turned to the 2006 forum selection clause and ruled that it conflicted with FINRA Rule 12213(a)(1), which provides that "[t]he Director [of FINRA Dispute Resolution] will decide which of [the] hearing locations will be the hearing location for the arbitration." J.A. 1313. Because the FINRA Rules "constitute[d] the arbitration contract between UBS and [WVUH]," the District Court concluded that "its provision on the hearing location" – and not the 2006 forum selection clause – determined the location of the arbitration. 760 F. Supp. 2d at 380.

By letter dated January 11, 2011, UBS informed the District Court that it did not intend to prosecute the case further and requested entry of a final order of dismissal. The District Court entered judgment on January 13, 2011. This appeal followed.

**DISCUSSION**

On appeal, UBS principally contends that the District Court should have enjoined the arbitration proceedings because there is no record evidence that WVUH was UBS's customer either when UBS underwrote the WVUH securities at issue or when it served as a broker-dealer for the ARS auctions. With respect to services UBS rendered in its capacity as a broker-dealer charged with facilitating the ARS auctions, we disagree and conclude that WVUH was UBS's customer under the applicable FINRA rules. We therefore affirm the District Court's order denying an injunction on that alternative ground.

"When reviewing a district court's denial of a preliminary injunction, we review the district court's legal holdings de novo and its ultimate decision for abuse of discretion." Cnty. of Nassau, N.Y. v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008) (citation and quotation marks omitted). "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). To prevail on its motion for a preliminary injunction, UBS was required to demonstrate "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010) (quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979)).

9

Since the parties agree that UBS will suffer irreparable harm if it is wrongfully required to arbitrate this dispute, we focus exclusively on UBS's claim that WVUH is not entitled to arbitration under FINRA's rules because WVUH did not become UBS's "customer" in connection with WVUH's issuances of ARS. For the reasons that follow, UBS has failed to demonstrate either a likelihood of success on the merits of that claim or sufficiently serious questions going to the merits to make a fair ground for litigation.

1. Customer-Member Arbitration Under FINRA's Rules

Since 2007, FINRA has been a self-regulatory organization established under Section 15A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o-3; Karsner v. Lothian, 532 F.3d 876, 879 n.1 (D.C. Cir. 2008); SEC Release No. 34-56145 (July 26, 2007), and has had the authority to exercise comprehensive oversight over "all securities firms that do business with the public." Sacks v. SEC, --- F.3d ---, 2011 WL 3437088, at *2 (9th Cir. Aug. 8, 2011) (quoting 72 Fed. Reg. 42170 (Aug. 1, 2007)). Upon joining FINRA, a member organization agrees to comply with FINRA's rules. See FINRA Bylaws art. 4 § 1, available at http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=4609 (last visited Sept. 19, 2011). As a FINRA member, therefore, UBS is bound to adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein. With respect to these provisions, the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq., "requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989); see also Bensadoun v. Jobe-Riat, 316 F.3d 171, 176 (2d Cir. 2003) (FINRA Rules must be interpreted in accordance with principles of contract interpretation). In

10

interpreting the FINRA Rules, we need not reach the issue of which state law applies.  Under New York, West Virginia, or Delaware[3] law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms[.]" Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002); accord Babcock Coal & Coke Co. v. Brackens Creek Coal Land Co., 37 S.E.2d 519, 522 (W. Va. 1946); Osborn v. Kemp, 991 A.2d 1153, 1159-60 (Del. 2010); 11 Williston on Contracts § 32:3 (4th ed. 2010).

With these principles in mind, we look to Rule 12200 of the FINRA Code, which obligates UBS to arbitrate a dispute with a "customer" at the customer's demand, subject to an exception not relevant here:

Parties must arbitrate a dispute under the Code if:

- Arbitration under the Code is either:

    (1) Required by a written agreement, or

    (2) Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Code, Rule 12200 (emphasis added) (all FINRA Rules available at http://finra.complinet.com/en/display/display_viewall.html?rbid=2403&element_id=607&record _id=609) (last visited Sept. 19, 2011).

---

[3] A number of agreements pursuant to which FINRA was formed state that they are governed by Delaware law. See, e.g., FINRA Manual 1061 (July 2008 ed.) (Limited Liability Company Agreement of the Trade Reporting Facility LLC).

We have observed that "if the rules of an exchange (or similar organization) require arbitration of customer disputes, a broker's membership obligation confers upon the customer an option to arbitrate as the exchange rules provide." Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship, 41 F.3d 861, 864 (2d Cir. 1994) (citing Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis, 903 F.2d 109, 113 (2d Cir. 1990)). A customer under the exchange's rules is entitled to invoke the arbitration provision "as an intended third-party beneficiary" in a dispute with a member. Id.

Although UBS is indisputably a "member" under the Code, neither FINRA nor the courts have "offer[ed] [a] precise definition of 'customer.'" Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995). The Code states only that "[a] customer shall not include a broker or dealer." FINRA Code, Rule 12100(i). An online FINRA glossary, to which no reference is made in the FINRA rules, states that a "customer" is "[a] person or entity (not acting in the capacity of an associated person or member) that transacts business with any member firm and/or associated person." FINRA, Glossary of Arbitration Terms, http://www.finra.org/ArbitrationMediation/Glossary/ (last visited Sept. 19, 2011). In cases interpreting FINRA's rules as well as predecessor rules promulgated by the National Association of Securities Dealers, Inc. ("NASD"), we have avoided offering an exhaustive definition of the term. See, e.g., Bensadoun, 316 F.3d at 176; Citigroup Global Mkts., Inc., 598 F.3d at 39; John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001) (noting that NASD Code "defines 'customer' broadly"). UBS asserts, and the parties conceded at oral argument, that "customer" means "someone who buys goods or services." Appellant's Br. at 18 (internal quotation marks omitted). See Webster's Third New International Dictionary 559 (3d ed. 2002) (defining "customer" as "one that purchases some commodity or service" (def. 2a)); id. at 1844

12

(defining "purchase" as "buy for a price" (def. 1d)); American Heritage Dictionary of the English Language 450 (4th ed. 2000) (defining customer as "[o]ne that buys goods and services" (def. 1)). Because the term is unambiguous with respect to this core definition, we need not here provide a comprehensive definition of the term under Rule 12200. The term "customer" includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member.

2. Application of FINRA Rule 12200

Under this framework, we consider UBS's argument that WVUH was not its customer.

Relying principally on the Third Circuit's decision in Patten, which held that an issuer was an underwriter's customer under the predecessor rules promulgated by the NASD, the District Court concluded that WVUH became UBS's customer because UBS served as the underwriter for those issuances. We need not resolve whether its ruling on this ground was correct,[4] since we affirm on the different ground that WVUH was UBS's customer because WVUH purchased a service, specifically auction services, from UBS. See, e.g., Boy Scouts of Am. v. Wyman, 335 F.3d 80, 90 (2d Cir. 2003) ("[W]e may affirm the judgment of the district court on any ground appearing in the record.").

---

[4] The court in Patten focused on a 1983 statement made by the NASD's National Arbitration Committee that "[a]n issuer of securities should be considered a public customer of a member firm where a dispute arises over a proposed underwriting," and held that the statement constituted a binding interpretation of the NASD rules. 819 F.2d at 405-406; accord J.P. Morgan, 712 F. Supp. 2d at 79. FINRA has not issued a comparable interpretive statement addressing the status of issuers vis-á-vis underwriters. Although we do not address whether every issuer is a customer of its underwriter, we disagree with the dissent's categorical assertion that issuers can never be customers "under any reasonable definition" of the term. Preska, C.J., Dissenting Op., post at [8] ("Dissent").

The section entitled "Compensation" or "Broker-Dealer Fee" in all three broker-dealer agreements reflects an undertaking by WVUH to pay UBS a fee for its services in facilitating the auctions at which the bonds were resold and their interest rates set. In view of that undertaking and a definition of customer that at least includes an entity that undertakes to purchase a good or service, WVUH became UBS's customer under Rule 12200 by contracting with UBS to obtain auction services for a fee.

In urging otherwise, UBS points to language in the broker-dealer agreements to suggest that WVUH agreed to compensate UBS "for the benefit of . . . investors" "who are buying and selling [WVUH's] auction rate[]" securities, not for WVUH's benefit. Tr. of Oral Arg. 6. Both the agreements taken as a whole and the specific compensation provisions on which UBS relies make plain that UBS's broker-dealer fee is for facilitating the auctions for the purpose of, among other things, "achieving the lowest possible interest rate on the [auction rate certificates]" for WVUH's benefit. J.A. 303. We reject UBS's suggestion that WVUH, a sophisticated party seeking to raise capital, charitably undertook to pay a substantial fee for the benefit of unknown investors rather than itself.

UBS also argues that WVUH is not its customer because the FINRA Rules do not contemplate arbitration for sophisticated parties such as WVUH, WVUH did not purchase investment or brokerage services, and UBS was not a fiduciary of WVUH. For support, it points to provisions of FINRA's rules intended to facilitate the arbitration of disputes between retail investors and brokerages, and to our decision in Bensadoun, 316 F.3d at 177, where we noted the Eighth Circuit's holding in Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc., 264 F.3d 770, 772 (8th Cir. 2001), "that banking advice did not give rise to a 'customer' relationship within the meaning of the NASD [rules]." We reject the argument for the following reasons.

14

UBS's argument about sophisticated parties ignores provisions of the FINRA Code, such as the rule governing depositions, that explicitly contemplate arbitration in "large or complex cases." FINRA Rule 12510.[5] See also FINRA Rule 12901 (specifying member surcharges for arbitrations involving $10,000,000 or more). Several FINRA rules expressly contemplate customers who are well-capitalized or sophisticated institutions and individuals. E.g., FINRA Rule 2124(e)(1) ("[For purposes of this rule,] 'institutional customer' shall mean a customer whose account qualifies as an 'institutional account' under NASD Rule 3110(c)(4)."); see also NASD Rule 3110(c)(4) ("[T]he term 'institutional account' shall mean the account of . . . a bank, savings and loan association, insurance company, or registered investment company; . . . or . . . any other entity (whether a natural person, corporation, partnership, trust, or otherwise) with total assets of at least $50 million."), available at http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=3734 (last visited Sept. 20, 2011). Other rules define "customer" broadly, with no restriction to unsophisticated, individual, or small investors. E.g., FINRA Rule 1250(b)(1) ("'Customer' shall mean any natural person and any organization, other than another broker or dealer, executing securities transactions with or through or receiving investment banking services from a member."); FINRA Rule 4530, n.08 ("[For purposes of this rule,] a 'customer' includes any person, other than a broker or dealer, with whom the member has engaged, or has sought to engage, in securities activities."). Consistent with these definitions, FINRA arbitration has been

---

[5] FINRA Rule 12510 is based on former NASD Rule 12510, which became effective in April 2007. See Order Approving Proposed Rule Change and Amendments 1, 2, 3, and 4 to Amend NASD Arbitration Rules for Customer Disputes, 72 Fed. Reg. 4574, 4594 (Jan. 31, 2007). The rule postdated the Eighth Circuit's decision in Fleet Boston by over five years and our decision in Bensadoun by four years.

employed to resolve complex claims arising out of the failure of the ARS market without any suggestion that the dispute was rendered non-arbitrable because of the parties' financial sophistication. E.g., STMicroelectronics, N.V. v. Credit Suisse Secs. (USA) LLC, 648 F.3d 68 (2d Cir. 2011) (upholding confirmation of $400 million award). We cannot say, therefore, that FINRA's rules exclude the arbitration of complex cases or those initiated by financially sophisticated parties.

We also reject UBS's contention that FINRA has a narrow "investor-protection mandate," such that "customers" should include only those receiving "investment or brokerage services." Appellant Br. at 24-25. FINRA's purposes are not limited to investor protection. Rather, as previously noted, FINRA serves as the sole self-regulatory organization chartered under the Exchange Act and exercises comprehensive oversight of the securities industry. See NASD v. SEC, 431 F.3d 803, 804 (D.C. Cir. 2005). Among its stated purposes are to "encourage and promote among members observance of federal and state securities laws"; "[t]o investigate and adjust grievances between the public and members and between members"; and "[t]o adopt, administer, and enforce rules of fair practice." Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010), available at http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=4589. UBS does not explain why "customer" should be limited to investors in light of FINRA's purposes, its other broad definitions of "customer" applicable to other provisions, and the ordinary usage of the term.

Similarly, we reject UBS's contention that a customer relationship requires a fiduciary relationship and cannot be founded on arm's-length transactions. UBS points to no support for this limitation in the text or structure of the FINRA Rules.

16

Finally, FINRA appears to have rejected the interpretation of FINRA's rules advanced by UBS and the dissent. While this appeal was pending, UBS raised the very argument it raises here in seeking a stay of arbitration from the Director of FINRA Dispute Resolution, who "perform[s] all the administrative duties relating to arbitrations submitted under the Code." FINRA Rule 12103. That motion was summarily denied. Though we need not rely on FINRA's decisions to conclude that WVUH was UBS's customer, we note that FINRA's practical application of its own rules in this case does not support UBS's position.

3. "In Connection with" UBS's Business Activities

Having determined that WVUH was UBS's customer by virtue of its undertaking to pay for UBS's auction services, we turn to whether its dispute with UBS "arises in connection with the business activities of" UBS, as Rule 12200 requires. UBS argues, and the dissent asserts, that there is no nexus between the auction service transactions, which establish customer status, and the alleged fraud involving the bond issuances, which both UBS and the dissent regard as forming the basis of WVUH's arbitration demand. More particularly, the dissent declares that our decision permits arbitration of the dispute between UBS and WVUH based on "the provision of ancillary services" (namely, the auction services) rather than the "gravamen" of the claim (that is, according to the dissent, the dispute concerning UBS's role as underwriter). Dissent at [**1**].

We are not persuaded. The auction services transactions that establish WVUH's customer status are integrally related to and of a piece with the underwriting services UBS provided. For example, all three purchase agreements between the parties termed WVUH's bonds "auction rate certificates," clearly envisioning that the bonds WVUH issued would be auctioned. J.A. 260, 938, 953. The "Official Statements" publicly announcing and providing

information about each bond issuance simultaneously detailed the terms of the issuance and underwriting arrangement and the auction procedures and UBS's role as auction broker-dealer. WVUH's Statement of Claim similarly characterizes UBS's underwriting and auction services as part of an integrated whole, alleging that "[t]he misrepresentations and omissions made by UBS . . . induced [WVUH] to enter into the recommended component transactions" – including underwriting, auction services and swap transactions – "using the structure proposed by UBS," J.A. 1090, and WVUH accordingly asserts claims for intentional misrepresentation, negligent misrepresentation, and fraud.

Nor are we persuaded by the dissent's suggestion that WVUH's claims relate to the underwriting arrangement alone, without reference to UBS's auction services. WVUH's Statement of Claim specifically asserts that UBS fraudulently induced WVUH to purchase auction services by misrepresenting the structure of the ARS market and UBS's role therein. The Statement of Claim variously alleges that "UBS represented that the ARS market was stable and would provide sufficient liquidity for WVUH's bonds," that "UBS did not inform WVUH that UBS had a policy of placing support bids in every auction to prevent auction failures," and that "UBS ultimately recommended that WVUH issue the majority of its 2003 ARS using a 'synthetic fixed rate structure.'" J.A. 1067-68. Furthermore, it demands "[r]estitution and disgorgement of all fees and costs associated with issuing the ARS, conducting the auctions, and any and all other associated fees and costs." J.A. 1098 (emphasis added). Under any conceivable interpretation of Rule 12200's nexus requirement that the dispute "arises in connection with the business activities of the member," the allegations here satisfy the requirement for purposes of defeating a motion for preliminary injunction and link the grievance WVUH asserts in arbitration to the transaction that established its customer status.

18

Lastly, the dissent endorses a "foreseeable consequences" test to assert that the dispute relating to the underwriting services is not arbitrable, even if the claims relating to auction services may be. While acknowledging that, "[i]f anything, the broker-dealer transaction flows from the underwriting transaction," the dissent states that "the underwriting transaction does not flow from the broker-dealer transaction" and is therefore not a "foreseeable consequence[] of the transaction for which arbitration is available." Dissent at [20]-[21]. The dissent's test has no apparent basis in the text of Rule 12200 or any other provision of the FINRA Code relating to arbitration. Even if we were to employ that test, moreover, arbitration of the underwriting services would be appropriate, as both the underwriting and auction services transactions were "foreseeable" when the purchase and broker-dealer agreements were executed. Indeed, the purchase agreements in 2003 and 2005 were entered over three weeks after the respective broker-dealer agreements, and the 2006 purchase agreement was entered within two days of the 2006 broker-dealer agreement.[6]

4. Forum Selection Clause

UBS also contends that, in the event it is compelled to arbitrate its dispute with WVUH, the forum selection clause in the 2006 broker-dealer agreement prohibits WVUH from

---

[6] Contrary to the dissent's characterization, we do not here establish a bright line rule or broadly pronounce that "once 'customer' status is established through a single transaction or agreement, any related matter may be arbitrated." Dissent at [15]. Our holding is that, in this case, UBS cannot avoid arbitration by arguing that WVUH was a customer only in a limited respect when the customer relationship is part of a series of interrelated transactions serving a common purpose and when there is a "contractual basis for concluding that the party agreed to" arbitration with a party that was its customer under the FINRA Rules. Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1775 (2010) (emphasis omitted). Nor does Stolt-Nielsen otherwise support UBS's position. The Court held in that case that class arbitration could not be inferred from an arbitration agreement that did not mention it; it hardly precludes arbitration where, as here, the text of the relevant agreement plainly covers it. Id.

19

proceeding with the arbitration outside of New York County. That clause states that "all actions and proceedings arising out of this Broker-Dealer Agreement and any of the transactions contemplated hereby shall be brought in the County of New York and, in connection with any such action or proceeding, [the parties] submit to the jurisdiction of, and venue in, such County."

UBS's argument finds some support in our decision in Bear, Stearns & Co. v. Bennett, 938 F.2d 31, 31-32 (2d Cir. 1991), where we enforced an agreement between two parties to arbitrate their disputes in New York City under the rules of the American Stock Exchange on the ground that "[w]here there is a valid agreement for arbitration, Congress has directed the district courts to order that arbitration proceed 'in accordance with the terms of the agreement.'" Id. at 32 (quoting 9 U.S.C. § 4). Two subsequent Supreme Court decisions have cast doubt on the continued viability of Bear Stearns. In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), the Court distinguished between (1) a "relatively narrow category" of "'questions of arbitrability'" that "include[] disputes about . . . 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy,'" Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38, 351 F.3d 43, 45 (2d Cir. 2003) (quoting Howsam, 537 U.S. at 84), and (2) "other kinds of general circumstances where parties would likely expect that an arbitrator would decide the gateway matter," including "'procedural' questions which grow out of the dispute and bear on its final disposition." Howsam, 537 U.S. at 84 (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)). In Howsam, the Court held that, unlike the former, the latter questions are "presumptively not for the judge, but for an arbitrator, to decide." Id. (dispute over applicability of an NASD time limit for filing claims is a presumptively arbitrable issue) (emphasis in original).

20

In Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003), a plurality of the Supreme Court held that whether an arbitration agreement forbids class arbitration is a procedural matter that under Howsam should be decided by an arbitrator, not a court. Id. at 452-53. The plurality emphasized that the relevant question was "what kind of arbitration proceeding the parties agreed to" (a procedural question), not "whether [the parties] agreed to arbitrate a matter" in the first instance (a question of arbitrability), and concluded that an arbitrator is better equipped to decide the procedural question. Id. (emphasis in original; citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942-45 (1995); Volt Info. Scis., 489 U.S. at 474-76)); see also Howsam, 537 U.S. at 85 (observing the superior competence of NASD arbitrators, respective to courts, in interpreting and applying NASD arbitration rules). We are guided by the rationale of Green Tree, which helps clarify Howsam.[7]

Here, UBS acknowledges that the issue relating to the 2006 forum selection clause arises only after the question of the arbitrability of the dispute has been resolved in favor of arbitration. In any event, the clause does not mention arbitration or the FINRA Rules or limit the tribunal in which a dispute may be initiated. It simply concerns the site of arbitration. Having now determined that WVUH was UBS's customer and that the dispute arises in connection with UBS's business activities, the question to be resolved is not "whether to proceed by arbitration, but which arbitration panel should decide certain issues." Cent. W. Va. Energy, Inc. v. Bayer

---

[7] Other courts have held that Justice Stevens's concurrence in the judgment, read together with the plurality opinion, produces a controlling rationale on this question. See Certain Underwriters at Lloyd's London v. Westchester Fire Ins. Co., 489 F.3d 580, 586 n.2 (3d Cir. 2007); Pedcor Mgmt. Co. Welfare Benefit Plan v. Nations Pers. of Texas, Inc., 343 F.3d 355, 358-59 (5th Cir. 2003). But see Emp'rs Ins. Co. of Wausau v. Century Indem. Co., 443 F.3d 573, 580 (7th Cir. 2006). Because Howsam controls this case, we need not decide whether Green Tree is also controlling in this regard.

21

Cropscience LP, 645 F.3d 267, 274 (4th Cir. 2011). Keeping in mind both this question and the federal policy in favor of arbitration, see Green Tree, 539 U.S. at 452, we hold that venue is a procedural issue that FINRA's arbitrators should address in the first instance, and that the District Court lacked subject matter jurisdiction to resolve it.

Our holding accords with the decisions of other sister courts in similar cases involving forum selection clauses. Relying on Howsam and Green Tree, the First and Fourth Circuits have both held that disputes over the interpretation of forum selection clauses in arbitration agreements raise presumptively arbitrable procedural questions. See Cent. W. Va. Energy, 645 F.3d at 276; Richard C. Young & Co. v. Leventhal, 389 F.3d 1, 4-5 (1st Cir. 2004) ("Since the dispute between the parties is concededly arbitrable, determining the place of the arbitration is simply a procedural matter and hence for the arbitrator.").[8]

## CONCLUSION

For the reasons stated, we AFFIRM the District Court's judgment dismissing UBS's claims. In so doing, we AFFIRM the District Court's January 4, 2011 order to the extent it denies UBS's motion for a preliminary injunction restraining WVUH from proceeding with FINRA arbitration. However, we VACATE that order to the extent it denies a preliminary injunction with respect to the forum selection clause and REMAND with instructions for the District Court to dismiss that challenge for lack of subject matter jurisdiction. We DENY as

---

[8] Without citing either Howsam or Green Tree or using the framework established in those cases, the Eleventh Circuit followed our decision in Bear, Stearns to conclude that venue is a matter for judicial rather than arbitral determination. Sterling Fin. Inv. Grp., Inc. v. Hammer, 393 F.3d 1223, 1225 (11th Cir. 2004). To the extent that arbitrators, not courts, presumptively have jurisdiction to adjudicate disputes over the enforceability of forum selection clauses, our holding to the contrary in Bear, Stearns was abrogated by Howsam, as clarified by Green Tree.

22

moot UBS's motion, made after oral argument, for an order staying arbitration during the pendency of this appeal.

PRESKA, <u>Chief District Judge</u>, dissenting:

Puzzlingly, the majority declines to answer the question squarely presented in this appeal — whether an issuer of securities is entitled under the FINRA Rules to arbitrate a dispute with its underwriter regarding the underwriting. More puzzlingly yet, the majority affirms a decision that such a dispute is subject to mandatory arbitration by answering a different question. It transforms this case into one where the provision of ancillary services about which there is no dispute entitles the issuer to arbitrate — and collect damages related to — a different dispute about a different transaction under a different contract. This cannot be. Judges may not employ this type of metamorphosis to decide contract cases. The majority errs in judgment and in law, so I respectfully dissent.

I.

The gravamen of WVUH's notice of claim is summarized in the first paragraph: WVUH alleges that UBS's misinformation defrauded WVUH into issuing ARS. Virtually the entire notice of claim is dedicated to allegations about the alleged fraud in causing WVUH to issue ARS, and the claimed damages are about the issuance transaction. Almost no other claim asserted discusses the purchase of ancillary auction services. One sentence in paragraph 114 of a 143-paragraph, 40-page notice of claim alleges that UBS's "misrepresentations and omissions ... induced Claimants to enter into the recommended component transactions,"

1

(Notice of Claim ¶ 114), presumably including UBS's ancillary auction services under separate broker-dealer agreements. Fixating on this single sentence, the majority effectively ignores the point of the notice of claim and requires UBS to arbitrate wide-ranging claims involving damages that are not consequential to the fraud alleged in the sentence in paragraph 114.

As in most of the ARS-related cases filed in the U.S. District Court for the Southern District of New York and appealed in this Court, WVUH's main claims are that in the course of underwriting WVUH's ARS issuance, UBS misrepresented the demand for ARS and manipulated the market for ARS with its own bids, artificially setting a low interest rate for ARS bonds. This state of affairs caused WVUH to issue ARS rather than traditional fixed- or variable-rate bonds. When UBS stopped submitting support bids for WVUH's ARS, the market for those ARS failed, causing interest rates on WVUH's ARS to soar to the "penalty rate" of 12-15%. Primarily, the resulting damages were significantly increased debt-service payments and significantly increased funding costs because WVUH's debt had to be refinanced to non-ARS bonds. This is an expensive undertaking in itself — another underwriting transaction — and, after the ARS debacle, WVUH had to purchase expensive bond insurance to reassure investors. Based on these facts, WVUH claimed breach of fiduciary duty, intentional and negligent misrepresentation,

breach of the underwriting agreement, violation of the securities laws, breach of warranty, and unjust enrichment.  Indeed, the breach of contract count states that "[a]s a result of UBS' agreement to serve as underwriter," (Notice of Claim ¶ 116 (emphasis added)), WVUH sustained damages; it does not discuss the broker-dealer agreements at all.  As WVUH framed the damages for these claims in the notice of claim, it sought "tens of millions of dollars . . . in increased interest charges and other funding costs."  (Id. ¶ 1.)  Specifically, WVUH says it is entitled to recover "all extra interest expenses,"  "refinancing expenses," and "bond insurance."  (Id. ¶¶ 100-103.)  Fees paid for auction services, which form the basis of the majority's holding, are not mentioned in the section of the notice of claim entitled "Claimants' Damages."

To be sure, WVUH tucks a claim for damages for fees paid for "component transactions" into the single count of the notice of claim containing the single sentence upon which the majority relies.  This presumably includes WVUH's ancillary claim for damages related to payment of fees for broker-dealer services provided under the broker-dealer agreements.[1]  WVUH had engaged

---

[1] The "component transactions" are never specified, and this term also probably covers interest-rate swaps, credit enhancements, and the like, which were provided under the underwriting and/or other agreements apart from the broker-dealer agreements.  While the notice of claim offers no further explanation, the majority now defines "component transactions" to include "underwriting, auction services and swap transactions." Majority Op. at 20.

3

UBS as its broker-dealer under separate contracts for a fee.  As broker-dealer, UBS agreed to solicit bids for WVUH's ARS, and it hired an agent then to collect and tally the bids and to match buyers and sellers under certain criteria to set the interest rate for the ARS for the next period.  There is no evidence in the record that UBS breached its broker-dealer agreements in any way, and WVUH did not make such an allegation.

In short, WVUH's notice of claim rings familiar to those involved in ARS-related litigation, of which there has been much.  The allegations involve UBS's alleged failure to disclose material information about the ARS market and UBS's bidding practices for its own account.  Here, WVUH has two sets of distinct grievances: one related to the underwriting and issuance of ARS, with damages consisting primarily of increased interest payments and refinancing costs, and another related to the alleged fraudulently induced purchase of "recommended component transactions," including broker-dealer services, with damages consisting of fees paid for those services.

The majority ignores these fundamental distinctions and concludes that by purchasing UBS's broker-dealer/auction services, WVUH is entitled to arbitrate — and obtain damages related to — a dispute not about being duped into purchasing UBS's broker-dealer services, but about being duped into purchasing UBS's underwriting services.  It says that conclusory allegations involving the purchase of broker-dealer services

4

"link the grievance WVUH asserts in arbitration to the transaction that established its customer status." Majority Op. at 20. This is not so. Both the claim for damages related to underwriting and the claim for damages related to the purchase of broker-dealer services involve proving that WVUH was duped. But the grievance asserted in arbitration is not being duped generally. The grievance is being duped <u>into taking a particular action</u>. <u>See</u> Restatement (Second) of Torts § 531 (1977) (stating that liability for fraudulent misrepresentation attaches "for pecuniary loss suffered by [the intended or foreseeable victims] through their justifiable reliance in the type of transaction in which [the tortfeasor] intends or has reason to expect their conduct to be influenced"); <u>id.</u> § 538 (stating that misrepresentation only actionable if a reasonable person would attach importance to the representation "in determining his choice of action <u>in the transaction in question</u>" (emphasis added)).

Based on the alleged fraud, WVUH took at least two separate actions for which it now seeks damages: it issued ARS, and it purchased broker-dealer services. The causes of action supporting and damages asserted for each grievance are wholly different and involve different evidence. Arbitration is unavailable for the issuance-related grievance because, as explained below, WVUH does not satisfy the definition of "customer" in the underwriting transaction. Yet the majority

5

permits an arbitration not only for the claim and damages related to the fees paid for broker-dealer services but also for the full panoply of claims and damages related to UBS's underwriting of these ARS. Put another way, the majority concludes that buying the services of a pilot entitles the buyer to arbitrate and obtain damages for a dispute about the purchase of an airplane, for which arbitration is independently unavailable. This is mistaken judgment.

On appeal, WVUH sums up the issue in its brief as follows:

> [WVUH] engaged [UBS] to recommend, design and implement an optimal financial structure for the issuances. UBS ultimately recommended that [WVUH] issue a portion of each bond offering as auction rate securities ("ARS"). UBS did not disclose to [WVUH], however, that UBS had been propping up the market for ARS through a ubiquitous support bid practice, and that if UBS stopped providing support the market for [WVUH's] ARS would collapse. When UBS stopped supporting the ARS market in February 2008, the market did in fact collapse, and [WVUH] suffered significant damages as a direct result.
> [WVUH] sought to recover those damages through a FINRA arbitration against UBS . . . .

(WVUH Br. at 11.) Accordingly, the parties' briefs focus on WVUH's allegations that UBS misled WVUH about the ARS market and about UBS's participation in it, which caused WVUH to issue ARS.[2]

---

[2] E.g., WVUH Br. at 18 ("The gravamen of [WVUH's] claims is that UBS inveigled [WVUH] . . . to employ a financial product (ARS) to raise capital . . . . UBS did this by concealing from [WVUH] that [WVUH] would pay [the projected low interest rates with ARS] only so long as UBS provided continuing bidding support in [WVUH's] ARS auctions. When UBS stopped providing this support, [WVUH's] auctions failed."); id. at 26 ("[WVUH] engaged
(continued...)

6

The parties dedicate a few stray sentences in their briefs to the broker-dealer agreements. WVUH suggests that UBS may have had a motive to recommend an ARS issuance because, aside from its profit on the underwriting spread, it could also earn fees from conducting the auctions. (WVUH Br. at 16.) But even when arguing that the broker-dealer agreements provide a basis for a "customer" relationship, WVUH returns to its "real" complaint here: that UBS misrepresented the fundamentals of the ARS market to induce WVUH to <u>issue</u> ARS. WVUH says, incorrectly, that UBS was engaged in misconduct in its role as broker-dealer "in submitting undisclosed bids to prop up the ARS market," which is the basis for WVUH's claim for damages relating to underwriting. (<u>Id.</u> at 27.) However, UBS, as broker-dealer, was not submitting but, rather, soliciting bids. In submitting bids, UBS (whether properly or not) was acting as a marketplace bidder, not an auctioneer. UBS's role in submitting bids for its own account thus cannot be a basis for damages for fraudulently inducing WVUH to buy broker-dealer services. WVUH's argument on appeal is a nonstarter.

The majority concludes that this Court does not have to resolve whether WVUH became UBS's "customer" because of UBS's underwriting services or advice that caused WVUH to issue ARS.

---

[2](...continued)
UBS to structure the three bond issuance at issue here and . . . advised [WVUH] to issue" ARS "in a structure proposed by UBS." (internal quotation marks omitted)).

7

However, as WVUH framed it, this is the question presented in this appeal, and this is the question WVUH submitted to FINRA arbitration for which it seeks related damages. I disagree with declining to answer this question and instead answering the question of whether WVUH's purchase of broker-dealer services entitles WVUH to arbitration on all of WVUH's claims.

The majority's approach is of concern because there is no basis in this record to conclude here that WVUH became UBS's "customer" in connection with the underwriting under any reasonable definition of the term.[3] The majority focuses on the plain-meaning definition of "customer": one who "purchases, or undertakes to purchase a good or service from a FINRA member." Majority Op. at 14. There is no record evidence in this case that WVUH undertook to pay or paid, in any form, UBS for underwriting the issuance of WVUH ARS or providing advice in connection with the issuance. As in any other negotiated underwriting transaction, UBS purchased the WVUH ARS from WVUH at a discount and resold the ARS in the market to UBS's customers. In that transaction, UBS took on the risks inherent in an offering of securities, and there is no record evidence that WVUH carried a cost for this transaction on its books. Thus, as explained below, WVUH did not "purchase" any goods or services

---

[3] Contrary to the majority's characterization, this dissent makes no "categorical assertion" that issuers can never be customers, merely that there exists no basis in this record to conclude that WVUH became UBS's "customer" in connection with the underwriting agreement. Majority Op. at 15 n.4.

8

from UBS pursuant to the underwriting agreement and thus did not become UBS's customer pursuant to that agreement. In contrast, the record reflects that WVUH undertook to pay UBS a specific fee for the provision of broker-dealer services pursuant to the broker-dealer agreements. Nevertheless, the majority permits WVUH to compel arbitration to seek damages from UBS not only for the broker-dealer transaction but also for the underwriting transaction.

The underwriting dispute and the broker-dealer dispute contain allegations about some of the same basic facts about nondisclosure of supply and demand for ARS and UBS's bidding practices. However, there are significant differences. The underwriting dispute involves allegations of breach of fiduciary duty, breach of the underwriting agreement, and securities law violations. The underwriting dispute necessarily would involve determining whether, because of the basic facts upon which it relied, WVUH issued ARS and is owed for increased interest payments made, missed opportunities on alternative options, advisory fees, debt restructuring costs, and debt insurance. The damages for these claims are in the tens of millions of dollars annually.

The facts involved in the broker-dealer dispute are entirely different. The broker-dealer dispute necessarily involves determining only whether, because of the basic facts upon which it relied, WVUH purchased broker-dealer services and

9

is owed for payment of a set 25 basis point fee on WVUH's issuance amount annually.  Because of this decision made by WVUH premised on the allegedly misrepresented facts, WVUH asserts a different claim of fraud for entering into a different transaction.  The damages for this claim are in the hundreds of thousands of dollars annually.  The transactions are different in their essential character.  <u>See</u> Restatement (Second) of Torts § 531 cmt. g (stating that the transaction induced by fraud "may differ in matters of detail or in extent [from that contemplated by defendant], unless these differences are so great as to amount to a change in the essential character of the transaction.").

If underwriting does not establish a "customer" relationship, it is not appropriate to allow a party to shoehorn a dispute about that transaction into an arbitration about a different transaction.  The fact that WVUH undertook to pay UBS to collect and tally ARS bids was not the primary aim of the alleged fraud.  The alleged fraud, as all of the materials before the Court allege, caused WVUH to enter into a transaction to issue ARS.  The issuance, not the broker-dealer agreement, resulted in increased interest and refinancing costs.  The fact that UBS, as underwriter, supposedly coaxed WVUH to issue ARS is the point of the notice of claim.  As an additional, necessary consequence of that transaction, WVUH also entered into a separate transaction to purchase broker-dealer services.  There is nothing in the record to suggest that WVUH had to purchase

10

these services from UBS; as the ARS-related litigation shows, many broker-dealers were available to perform these services.[4] That the three purchase agreements termed the WVUH bonds "auction rate certificates," Majority Op. at 19, contemplated only that the bonds would necessarily be auctioned, not that UBS in its capacity as an underwriter would undertake to auction them absent a separate agreement. It cannot be that this separate transaction that is downstream from the alleged fraud allows for arbitration of the upstream consequences of the alleged fraud when the upstream consequences are not arbitrable on their own. The law and logic permit a party to obtain damages consequential to the claimed wrong. They do not permit the converse. The damages related to WVUH's purchasing the broker-dealer services were possibly a consequence of the underwriting. But the damages related to the underwriting were not a consequence of WVUH's purchasing broker-dealer services. It is for this same reason that UBS's subsequent release of "Official Statements" detailing both the underwriting arrangement and its role as auction broker-dealer is insignificant. The majority's re-characterization of this multi-part ARS process as an "integrated whole," Majority

---

[4] See, e.g., In re Citigroup, Inc., No. 09 MD 2043, 2011 WL 744745, at *2 (S.D.N.Y. Mar. 1, 2011) ("Investors submit buy, sell, or hold orders through broker-dealers selected by issuers of the ARS [here, Citigroup]." (emphasis added)); In re Merrill Lynch ARS Litig., 758 F. Supp. 2d 264, 271-72 (S.D.N.Y. 2010) (Merrill Lynch serving as broker-dealer). Indeed, in this case, Deutsche Bank provided the auction-related services for UBS as its agent. A. 296-323.

11

Op. at 20, does not alter the facts that WVUH and UBS entered into two separate and distinct transactions and there was no requirement that WVUH had to retain UBS to perform the component services. See n.4 supra.

The majority relies on the seemingly stray sentences in the notice of claim alleging fraud in the inducement to enter into the agreement for component services. Majority Op. at 7, 20. To the extent an arbitration based on those allegations were permitted to proceed,[5] it would be limited to the claim that arises from the broker-dealer transaction creating "customer" status. Damages would be limited to the fees paid for the purchase of broker-dealer services (and any consequential damages allowable). The result the majority reaches allows WVUH to obtain damages for another claim by using a Trojan Horse. It allows the arbitration of one claim (alleged fraudulent inducement to buy broker-dealer services) to become a basis for damages for a different claim entirely (misstatements or omissions in connection with an underwriting transaction). I do not concur in this error of judgment.

## II.

The majority also commits an error of law. FINRA is a self-regulatory organization, and its rules are creatures of

---

[5] It is not entirely clear to me that this result is required. The 2006 broker-dealer agreement states that the parties shall "submit to the jurisdiction of . . . [New York] County."

agreement among the members.  As the majority correctly points out, the FINRA Rules are interpreted as contracts are.  The majority also correctly concludes that because FINRA Rule 12200 gives "customers," who are not FINRA members, an option to arbitrate, "customers" are intended third-party beneficiaries. Because the term "customer" is not defined in the FINRA Rules, determining whether a party invoking the right to arbitrate is a "customer" resolves whether that party is entitled to arbitration under the FINRA Rules in any given case.  Making this determination is no different from ordinary contract interpretation: the question is whether the contracting parties intended to confer the right to arbitrate.  Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 124-25 (2d Cir. 2005) (third-party beneficiary claim may be dismissed when "language in the contract or other circumstances . . . will not support the inference that the parties intended to confer a benefit on the claimant"); 9 Corbin on Contracts § 44.6 (Joseph M. Perillo ed., 2009) ("Whether a promisor and promisee intend to confer upon the third party a right to enforce the contract against the promisor will depend upon the same rules and guides to interpretation as are applied in other contexts.").

     The contractual nature of the FINRA "customer's" entitlement to arbitration is essential.  "Arbitration is strictly a matter of consent."  Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2857 (2010) (internal quotation marks

13

omitted).  When the arbitration agreement's "enforceability or applicability to the dispute is in issue," the court "must resolve the disagreement."  Id.  "In this endeavor, as with any other contract, the parties' intentions control."  Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1774 (2010) (internal quotation marks omitted); see Bensadoun v. Jobe-Riat, 316 F.3d 171, 176 (2d Cir. 2003).

Therefore, parties may "structure their agreements [to arbitrate] as they see fit."  Stolt-Nielsen, 130 S. Ct. at 1774 (internal quotation marks omitted).  Parties may limit such an agreement in myriad ways.  They may "agree to limit the issues they choose to arbitrate," "choose who will resolve specific disputes," and "specify with whom they choose to arbitrate their disputes," among other things.  Id.  Indeed, they may specify that only certain disputes are subject to arbitration.  Id. at 1774-76; EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002) ("[N]othing in the statute authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the agreement.").  In other words, arbitration by contract "is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration."  First Options of Chi. v. Kaplan, 514 U.S. 938, 943 (1995) (emphasis added).

"It falls to courts . . . to give effect to these contractual limitations, and when doing so, courts and

14

arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties."  Stolt-Nielsen, 130 S. Ct. at 1774-75.  In my view, the majority has lost sight of these principles in deciding this case.

Although the majority discusses a "nexus requirement" inherent in FINRA Rule 12200 — a proposition with which I fully agree because there must be a relationship between the dispute giving rise to "customer" status and the dispute the "customer" seeks to arbitrate — the majority's analysis does not comport with principles of contract.  The definition of "customer" and the "nexus requirement" are at best loosely defined in the FINRA Rules.  As the Supreme Court pointed out in Stolt Nielsen, "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."  Id. at 1775 (quoting Restatement (Second) of Contracts § 204 (1979)).

It is not reasonable, as the majority opinion presumes, to think that the parties to the FINRA Rules agreed that once "customer" status is established through a single transaction or agreement, any related matter may be arbitrated.  It is not reasonable to find, as the majority does, that just because an underwriting transaction between WVUH and UBS made it foreseeable that WVUH would purchase ancillary services from someone, not

15

necessarily UBS, the agreement to arbitrate disputes arising out of the purchase of those services can somehow be construed as an agreement to arbitrate disputes arising out of the underwriting agreement. The Supreme Court in <u>Stolt-Nielsen</u> rejected similar reasoning. In that case, an arbitration panel determined that because an uncontested bilateral arbitration agreement did not contain any language precluding class arbitration, the party to the bilateral agreement had agreed to class arbitration. <u>Id.</u> The Court rejected the view that once an entitlement to arbitration is established, any claim may be arbitrated. <u>Id.</u> Instead, the Court required that there must be "a contractual basis for concluding that the party <u>agreed</u> to" the particular arbitration. <u>Id.</u> The same concerns addressed in <u>Stolt-Nielsen</u> are applicable here and in future ARS disputes. The majority's attempt to limit its holding to the facts of "this case," Majority Op. at 21 n.6, evidences its continued misunderstanding of the individual and separate agreements comprising ARS transactions generally.

In an analogous scenario to this case, the Court of Appeals for the Eleventh Circuit, interpreting the precursor NASD Rules, held that the transaction creating "customer" status must occur at the time of the events constituting the alleged fraud. <u>Wheat, First Sec., Inc. v. Green</u>, 993 F.2d 814, 820 (11th Cir. 1993). Where a broker-dealer that entered into the challenged transaction conferring "customer" status becomes a NASD member

16

only _after_ the transaction is complete, the court held that it would "do significant injustice to the reasonable expectations of NASD members" to require the newly minted NASD member to arbitrate.  Id.  Its reasoning anticipated the later admonition of the Supreme Court in Stolt-Nielsen that arbitration may be ordered only when there is a contractual basis for finding an agreement to arbitrate the claim in question.  See id. ("We cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer.").  I cannot imagine that a FINRA member would have contemplated that a separate transaction involving a different agreement, different facts, and different damages would entitle a party that became a "customer" because of that transaction to require arbitration of claims arising out of a different transaction.

In the FINRA context, a single party may have a host of business dealings with a FINRA member, and each of those dealings could — or could not — give rise to "customer" status independently.  Each dealing, in effect, contains a possible entitlement to arbitration under the FINRA Rules because a business transaction with a member gives rise to "customer" status.  It is reasonable in the circumstances to construe the intent of the FINRA Rules as allowing "customers" to compel arbitration for the transaction that gives them such an

17

entitlement and not for other transactions.  See Consol. Edison, Inc. v. Ne. Utils., 426 F.3d 524, 529 n.2 (2d Cir. 2005) (distinguishing between transactions to determine whether third-party beneficiary rights bestowed for specific transactions); Leawood Bancshares Inc. v. Alesco Preferred Fundings X, Ltd., No. 10 Civ. 5637, 2011 WL 1842295, at *4 (S.D.N.Y. May 10, 2011) (same).  Therefore, whether a certain transaction with a FINRA member makes the other party a "customer" must be determined for that transaction to find an agreement to arbitrate in any particular case.  See Stolt-Nielsen, 130 S. Ct. at 1775; First Options, 514 U.S. at 943; cf. Wheat, First, 993 F.2d 814 at 820. This is all the more true when, as here, the agreement to arbitrate is an ill-defined third-party beneficiary right under the FINRA Rules.[6]  See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) ("[A] disagreement about whether an

---

[6] Because a party may transact business with a FINRA member and be a "customer" in some instances but not in others, this is not a situation where the presumption in favor of arbitrability applies.  See Granite Rock, 130 S. Ct. at 2858; Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011).  Instead, in challenging a complainant's "customer" status, the FINRA member is, in essence, "challenging the enforceability of the arbitration clause itself" in that transaction.  Granite Rock, 130 S. Ct. at 2858.  In other words, the question is whether a third-party beneficiary right was conferred for that transaction, not whether, in the face of a clear third-party beneficiary entitlement to arbitration, a certain dispute is arbitrable.  In any event, the policy favoring arbitration does not "override the principle that a court may submit to arbitration only those disputes that the parties have agreed to submit."  Id. at 2859 (internal quotation marks and alteration omitted).

arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.").

Because of this vagueness, other cases, including some in this Circuit, have similarly looked for aids in determining what transactions reasonably give rise to "customer" status under the NASD Rules when presented with unique claims. See Bensadoun, 316 F.3d at 177 (citing with approval the proposition that a "customer" is only "one involved in a business relationship with an NASD member that is related directly to investment or brokerage services"). Most cases finding an entitlement to arbitration are run-of-the-mill "customer" disputes — even in ARS cases — where a party uses a broker-dealer to purchase securities and disputes the purchase transaction. E.g., STMicroelectronics, N.V. v. Credit Suisse Secs. (USA) LLC, 2011 WL 2151008 (2d Cir. June 2, 2011) (cited by the majority at 17). The ARS context aside, this case does not involve a dispute about the purchase of securities from a broker-dealer, and an agreement to arbitrate the disputed transaction must be found before arbitration is mandated.

To find an agreement to arbitrate, a stronger nexus is required between the transaction creating "customer" status and the dispute than that found by the majority. Otherwise, no principled limits on a FINRA member's agreement to arbitrate would exist. The Supreme Court has not condoned ignoring limits on agreements to arbitrate. See Stolt-Nielsen, 130 S. Ct. at

19

1774-75. And it is appropriate to consider the circumstances and logical basis for determining whether a party is or is not a "customer" with respect to a certain dispute. Restatement (Second) of Contracts § 302, cmt. a ("A court in determining the parties' intention should consider the circumstances surrounding the transaction as well as the actual language of the contract.").

A reasonable construction of a "nexus requirement" is that a "customer's" complaint must arise out of the transaction conferring "customer" status. This rule would ensure that in any specific transaction, the FINRA member intended to entitle its counterparty to arbitrate a dispute arising out of the transaction. As I explained in Part I, <u>supra</u>, it cannot be that the transaction conferring "customer" status arises out of the transaction complained of. That is putting the cart before the horse. Only the foreseeable consequences of the transaction for which arbitration is available — not some other transaction — are includable within that arbitration. <u>Cf.</u> Restatement (Second) of Contracts § 347 (stating that only losses "incidental or consequential" to the breach are available as damages); Restatement (Second) of Torts § 549 (damages available for fraudulent misrepresentation for losses "suffered otherwise as a consequence of the recipient's reliance upon the mispresentation").

In this case, purchasing broker-dealer services may be a foreseeable consequence of issuing ARS, but issuing ARS is not a foreseeable consequence of purchasing broker-dealer services. Thus, although damages relating to the purchase of broker-dealer services could be included in an arbitration about underwriting, damages relating to the issuance of ARS cannot be included in an arbitration about purchasing broker-dealer services. The underwriting, issuance, and auctions are all related, but the purchase of broker-dealer services was done by way of an agreement separate from the underwriting agreement for a separate fee. To be sure, engaging a broker-dealer was necessary for the ARS to function. But, as noted above, those services could have been sourced elsewhere (indeed, Deutsche Bank provided the bulk of them in this case as UBS's agent). The underwriting and the broker-dealer transactions are different. Even if the broker-dealer transaction gives rise to "customer" status, the underwriting transaction does not flow from the broker-dealer transaction. If anything, the broker-dealer transaction flows from the underwriting transaction. The underwriting transaction cannot be the basis for mandatory FINRA arbitration because there is no evidence that WVUH undertook to pay or paid UBS for any underwriting service. Because the underwriting transaction is not subject to mandatory arbitration, the claims for damages related to underwriting cannot be included, as a matter of contract, in a mandatory arbitration over the transaction for

21

broker-dealer services.  Therefore, the majority's holding fails to determine satisfactorily that the parties "<u>agreed to authorize</u>" arbitration about the underwriting.  <u>Stolt-Nielsen</u>, 130 S. Ct. at 1776.

For all of these reasons, UBS satisfies the standard for granting a preliminary injunction, which is the operative question reviewed here.  It has at least demonstrated that there are sufficiently serious questions about the merits to make the case "fair ground for litigation," and the balance of hardships tips in favor of UBS because being required to arbitrate a claim means that the party forfeits a substantial right.

Respectfully, I dissent.